No. 23,181.

BENJAMIN F. HAAS, *Appellee*, v. THE KANSAS CITY LIGHT & POWER COMPANY, *Appellant*.

### SYLLABUS BY THE COURT.

COMPENSATION ACT—*Injury to an Oiler of Machinery—Accident Did Not Arise Out of and in Course of His Employment*. A workman, employed as a night oiler of machinery in an electrical power house, whose only duties were to oil certain engines and pumps in one part of the building, left his work and went a distance of 25 or 30 feet to a narrow entrance leading into a room where he knew he had no business to be, and which was filled with electrical machinery dangerous to life, but which contained nothing that required the services of an oiler. While in the room he reached with his hand about 8 inches into a recessed place in the wall and came in contact with electrical appliances and received serious injuries. *Held*, that his injuries did not result from an accident arising out of and in the course of his employment, and that he is not entitled to recover under the workmen's compensation act.

Appeal from Wyandotte district court, division No. 2; FRANK D. HUTCHINGS, judge. Opinion filed May 7, 1921. Reversed.

*O. L. Miller*, of Kansas City, and *John H. Lucas*, of Kansas City, Mo., for the appellant.

*L. O. Carter*, of Kansas City, and *W. W. McCanles*, of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

PORTER, J.: In an action under the workmen's compensation act the plaintiff recovered judgment. The appeal presents the sole question whether his injuries were caused by an accident which arose out of and in the course of his employment.

Benjamin Haas, an oiler of engines and pumps, employed at defendant's power house in Kansas City, received serious injuries when his right hand came in contact with electrical appliances known as bus bars; the current passing through his body, and he was so badly burned that his right arm had to be amputated two inches below the elbow, and he received other serious injuries. The petition alleged that at the time of the accident he was working in the due course of his employment.

The answer alleged that the accident did not arise out of or in the course of plaintiff's employment, but that plaintiff negligently left his place of work and went into a room of the plant where he had no duty to perform and where he had been instructed not to go, which room was necessarily filled with high-voltage machinery, dangerous to life, and that while in the room the plaintiff carelessly attempted to reach into and between parts of the dangerous machinery, not in performance of any duty in relation thereto, but for his own purposes, and thus came into contact with the electric current.

The power house of defendant is 170 feet in length north and south, and a little over 60 feet in width. The engines and pumps at which plaintiff worked as an oiler were those on the upper floor, and others which were just north of the center of the basement floor. The bus room extends clear across the south end of the basement and is about 60 feet east and west and 25 feet north and south. The room is set apart from the rest of the basement by a brick wall which extends from the floor to the ceiling, and the only way of getting into the room is through narrow archways two feet wide at the east and west ends of the room.

The bus room is filled with powerful electrical equipment, conducting wires and switches. Oil switches receive their name from the fact that the parts carrying current separate under oil when the circuit is broken. The container in which each switch is located stands on a stone slab of shelf supported by a brick structure. The bus bars are placed in a wall of the room in recessed compartments which are eighteen inches deep from front to back, the bus bars extending through the center of these spaces. The reason for putting them in the recesses is to prevent accidental contact with the bars and also to provide insulation. The bars run behind columns which cover up the face of the bus structure. There were a dozen of these oil switches in the bus room extending from the floor upward about seven feet. No portion of the electrical apparatus in the bus room requires the attention of anyone except that of the chief electrician or his assistant. When the services of a construction gang are required in the bus room the current is cut off. The room and the numerous passageways between the different high-power appliances and machinery are all

lighted with 100-watt lamps and outside each of the narrow entrances leading into the bus room is a sign reading, "No Admittance." Immediately inside of each archway there is a sign reading, "6600 Volts Danger." The testimony of the plaintiff's witnesses as well as those of the defendant is that an oiler never has any occasion to go into the bus room because there is no machinery there that requires oiling or attention.

Before the accident plaintiff had been in the employ of the defendant for six weeks; first in the construction gang about the power house, and six days before the accident he was given a place as an oiler. His testimony is that he was instructed as to his duties by Arthur Ravinaw, who was an experienced oiler. The testimony of plaintiff, in substance, was as follows:

He is 22 years old and had been oiling for five days before the accident. Ravinaw gave him instructions as oiler. His duties were to oil pumps downstairs and one pump upstairs. He worked at nights. The night he was injured he went to work at six o'clock. After oiling the machinery "got my check and Schultz and I went to the state line and got them cashed." After his return he went downstairs and started to oil machinery. He went from the boiler room into the engine room, and while there he heard a noise and walked back upstairs to Ravinaw—"heard noise something like it was cutting or dragging, needing oil." It sounded like it was in the south part of the building. Ravinaw had told him to report to him anything he did not understand. He had never been in the bus room, did not know it was dangerous to go in there and had never seen any sign of danger or any sign of volts. He told Ravinaw to come downstairs—wanted to show him something or tell him something—did not know which. "Went downstairs. Ravinaw went down. Went toward bus room, still hearing noise; went into bus room, turned around to see if Ravinaw was there." That was the last he remembered. He could not tell where he got to in the bus room. He did not have a bottle of whisky with him in there. He didn't know where Ravinaw was when he turned around and did not remember anything after starting to turn around. He was lower oiler and the things he had to oil down there were the oil pump on the west side of the basement about the middle of the room, two pumps on the east side of the basement about the middle

at base of engines, and one pump near the south end of the base of the north engine. There was nothing south of that in the basement that he had to oil—nothing that he knew of that had to be oiled. Neither Mr. Ravinaw nor anyone else had pointed out any machinery of any kind to him to oil south of where he worked in the basement. All his work in the basement was at or north of the center of the building on that floor.

On cross-examination he said that on the night of the accident he went with Schultz to the saloon to cash checks. Schultz bought beer for himself and plaintiff and plaintiff bought beer for himself and Schultz. Schultz bought a half pint of whisky. Plaintiff did not say to Schultz, "Think I will get a half pint and take . . . to Ravinaw." When he went back to the plant he left Schultz in the boiler room and went down to the basement to oil pumps on the west side and went up from there to the boiler room where Ravinaw was. They were alone. "Can't say whether I said to him, I wanted to tell him something or show him something, or ask something, one of the three. Nothing to prevent me telling him right there. *Said nothing to him about noise;* noise was not up there. . . . No one told him not to go into the bus room; didn't know what was in there; didn't know what was in the south end of the building at all; never had been in there." He did not know how he got his hand in the hole behind the column. He was asked:

"When you first went into the passageway, what about this supposed noise you have been talking about? A. Well, I think it was some kind of machinery that needed oil.

. . . . . . . . . . . . . . .

"Q. . . . Now then you knew when you were going in around there [bus room], as you say, that there was not any noise in there, and the noise, if there was any you heard, was upstairs? A. Yes, sir.

"Q. . . . And you haven't any explanation of how you got in there . . .? A. No, sir, only just . . . when I went in there, was looking for this noise."

Ravinaw, the first witness called by plaintiff, testified that when Haas began as an oiler he gave him his instructions, told him what he was to oil and where, which was in part of the basement and part of the upper floor. Ravinaw knew there were oil switches in the bus room but did not know how many, and knew that there was nothing in the bus room that called an oiler in there—nothing that needed to be oiled. Just before

the accident he had a conversation with plaintiff in the boiler room. Plaintiff said to come downstairs, that he wanted to show the witness something or tell him something; witness could not say which it was. Haas started downstairs and witness followed him; he went straight on; saw him going into the bus-room door. Witness had never instructed him not to go in there. He followed him in rapidly; found him standing with his hand against the wall, facing west; his right hand was next to the wall. It was light in there; his right hand was up on top of the bus bars and witness tried to pull him off and got an electrical shock; told the switchboard operator, and the current was cut off. When Haas told him to come downstairs —that he wanted to show him something, or tell him something, the witness did not know what it was, but there was nothing to prevent the plaintiff from telling him right there; he could see no reason why he could not tell it right there if there was anything to be said.

On cross-examination he admitted testifying in the Federal court that when he found Haas the latter was standing with his "hand stuck into that hole in the wall," and he said that that was where the plaintiff's hand was. His testimony was that a person passing through where Haas was injured could not reach the bus bars except by putting his hand in through the opening. Ravinaw said that when he went to work there he was told not to go into the bus room because of the danger; that he had been in by himself, and once with the electrician— just walked through; but that nobody had any business in that room except the electrician and his helper.

Doctor Frank J. Iuen, a witness for defendant, testified that he was the surgeon for the company and treated plaintiff after his injuries at a hospital in Kansas City, Mo.; that he was present at an interview that took place between the claim adjuster of the company and the plaintiff at the hospital when the plaintiff was practically sitting up in bed, and in the opinion of the witness was perfectly clear mentally; and that plaintiff made the following statement to the claim adjuster which was taken down by the latter:

"I just walked into the bus room and must have gotten hooked up the moment I got in there. There was no one in the room when I went in, and, as for what I had to tell Ravinaw, it was a little foolishness, and it

does not matter. . . . My duties were to oil the engines on the first floor and basement. I had no business in the bus room, as my duties did not take me there and the bus room was forty-five or fifty feet south of the pump which I was employed to oil."

The plaintiff, on cross-examination, was asked whether he made these statements and answered:

"I think I did, yes, sir, I remember his being there but don't remember a thing I told him."

Mr. Myers, night operator of defendant's switchboard, who shut off the power when notified of the accident, testified that the bus room was as light as day; and he, with other employees who went to the relief of the plaintiff at the time of the accident, identified photographs showing the footprints of the plaintiff burned into the concrete by contact with the bars. The night operator testified also that there is still the burned place on the bus bar where the plaintiff's hand came in contact with it at a point eight inches back from the opening in the recess compartment.

Schultz testified that on the night of the accident he went with Haas to the saloon; that they both bought beer and that Haas said, "I believe I will get a half pint of whisky and give Ravinaw a drink," and that he bought the whisky. When the accident happened and the current was cut off he ran and told Anderson and then went to the bus room. "Ravinaw said when we got down there, 'the bottle of whisky is in the little pigeon hole there, don't say anything to Anderson about it.' After the lights went out I put my hand in there and got it and broke it. It was against the rules to have whisky around the plant." The witness was the first person in there after the lights and power were turned off. He also testified that Anderson brought the plaintiff to him to be instructed as oiler and directed the witness in plaintiff's presence to show him where to oil and to show him about the bus room, and that Anderson said not to go in there; that he told Haas about the bus room; and that there was nothing in there to oil.

The plaintiff in support of the judgment cites the case of *Brick Co. v. Fisher*, 79 Kan. 576, 100 Pac. 507. That was a case under the factory act, where four men were employed to work at a certain machine, and the rules permitted each one to

Haas v. Light & Power Co.

take a turn at resting while the others operated the machine. It was held that a resting employee was engaged in the performance of duty the same as if he were occupied at the machine and that the employer's duty to guard machinery according to the factory act (Laws 1903, ch. 356) extends to all places which employees may reasonably be expected to use in the performance of their duties, including the taking of turns in resting.

We do not believe this case falls within the doctrine of the cases where, during rest periods or at the noon hour, workmen have sustained injuries on the premises where they are employed—as was held in *Thomas v. Manufacturing Co.*, 104 Kan. 432, 179 Pac. 372, where a seventeen-year-old girl who remained on the premises where she was employed during a half-hour intermission at noon, and after eating her lunch, was injured by falling from a truck pushed or drawn by a fellow employee. Nor does the present case fall within the doctrine of *Chance v. Coal & Mining Co.*, 108 Kan. 121, 193 Pac. 889, where it was ruled that an injury which occurs while an employee is doing what he might reasonably do at the time and place is one which arises "out of and in the course of his employment."

The words, "out of and in the course of the employment" have been uniformly held by the British courts and many American courts to be used conjunctively and not disjunctively. In the case of *Fitzgerald v. N. G. Clark & Son*, (1908) 2 K. B. 786, Buckley, L. J., after stating this rule, said:

"The words 'out of and in the course of the employment' are used conjunctively and not disjunctively. Upon ordinary principles of construction they are not to be read as meaning 'out of'—that is to say, 'in the course of.' The former words must mean something different to the latter words. The workman must satisfy both the one and the other. The words 'out of' point, I think, to the origin or cause of the accident. The words 'in the course of' to the time, place and circumstances under which the accident takes place. The former words are descriptive of the character and quality of the accident, the latter words relate to the circumstances under which an accident of that character or quality takes place. The character or quality of the accident as conveyed by the words 'out of' involves, I think, the idea that the accident is in some sense due to the employment. It must be an accident resulting from a risk reasonably incident to the employment." (p. 799.)

In *Craske v. Wigan,* (1909) 2 K. B. 635, Cozens-Hardy, M. R., said:

"I think it would be dangerous to depart from that which, so far as I am aware, has been the invariable rule of the Court of Appeal since these Acts came into operation, namely, to hold that it is not enough for the applicant to say 'The accident would not have happened if I had not been engaged in that employment or if I had not been in that particular place.' He must go further and must say 'The accident arose because of something I was doing in the course of my employment or because I was exposed by the nature of my employment to some peculiar danger.'" (p. 638.)

Following this construction of the statutes it has been held that an engine driver who goes across the rails to a signal box to inquire the time for his own purposes, when his path does not cross the rails, is not in the course of his employment. (*Benson v. Lancashire & Yorkshire Railway Company,* [1904] 1 K. B. 242.) And in *Keen v. St. Clement's Press, Ltd.,* 7 B. W. C. C. 542, it was held that a workman, who in order to conceal from the night shift of workmen a tin of milk used by him in his tea, attempts to put it on a ledge in close proximity to a reciprocating plant and is thereby injured does not suffer injury by accident arising out of and in the course of his employment.

The English courts have consistently ruled that where a workman attempts to do work around a machine with which his duties have no connection, he cannot recover under the compensation acts.

Among the American cases cited by the defendant are two which we think illustrate the rule which controls the present case. In *Mann v. Glastonbury Knitting Co.,* 90 Conn. 116, the rule was stated to be that an injury to an employee does not arise out of and in the course of his employment under the workmen's compensation act "unless it was received by him while he was acting within the scope of his employment, and unless there was a causal connection between the conditions surrounding the performance of his work and the resulting injury," and that where the injury arises from a risk of the business but is received while the employee has turned aside from his employment for his own purposes without the knowledge or consent of the employer, it does not arise out of the employment. In that case the employer knew that its em-

Haas v. Light & Power Co.

ployees were accustomed to heat their luncheon bottle of tea or coffee in the hot-air pipe of the dry room of its plant and made no objection thereto. "Held that such tacit or implied assent by the master to the custom of heating bottles at that particular place could not reasonably be said to involve permission to an employee to go into another room and put his bottle inside of the hot-air pipe through a door therein which opened upon a revolving fan; and that in so conducting himself the employee was not acting within the scope of his employment, nor was there any causal connection between the conditions under which his work was required to be done and the injury to his hand from the revolving fan." (Syl. ¶ 4.)

The opinion recognizes the right to compensation if an injury arising from a risk of the business is sustained while the employee is doing something which, although quite outside of his particular duty, is permitted by his employer for their mutual convenience, such as eating his dinner on the premises or any similar act, to the performance of which the employer has assented. But in the opinion it was said:

"On the other hand, if the injury, although it arise out of a risk of the business, is received while the employee has turned aside from his employment for his own purposes so that he is not acting within the scope of his employment, no compensation can be given." (p. 120.)

Another case cited by the defendant is *Spooner v. Detroit Saturday Night Co.,* 187 Mich. 125. There a workman was employed to operate an engine and dynamo in the basement and no duty called him to the upper floors. He received injuries which caused his death while running an elevator from the second to the third floor, in attempting to accommodate some fellow workman. It was held that the accident did not arise out of and in the course of his employment. It was said in the opinion:

"In the instant case Spooner was rendering no service which was either accepted by or known to his superior, but was engaged in a voluntary, friendly act entirely outside the scope of his employment upon the night in question." (p. 132.)

In the case at bar the evidence shows conclusively that the plaintiff abandoned the work he had been employed to do and the place where he was employed to work and went on a considerable journey into a dangerous part of the plant where

his own admissions and all the testimony show he knew he had no business to be. From the plat of the building and the testimony it appears that in order to get to the place where he received his injuries he had to leave the center of the basement, go to the west wall of the building, then a distance of about 25 feet to the west archway, and after passing through that, 25 feet to the south wall, then east about 25 feet to the first opening to the north, and then about 10 feet to the place of the accident, the distance from the entrance into the bus room being about 60 feet.

It must be held, therefore, that the accident which caused the plaintiff's injuries did not arise because of anything he was doing in the course of his employment, nor because he was exposed by the nature of his employment to that particular danger. The accident did not arise out of and in the course of his employment.

It follows that the judgment is reversed and the cause remanded with directions to enter judgment for the defendant.