97 So.2d 776

**C. J. LARSON et al., d/b/a Tide Finance Company,**

v.

**STATE of Alabama ex rel. John PATTERSON, Attorney General.**

**3 Div. 749.**

Supreme Court of Alabama.

July 26, 1957.

Rehearing Denied Nov. 14, 1957.

Wallace L. Johnson, Mobile, Winton G. Wilson and S. Palmer Keith, Jr., Birmingham, D. Eugene Loe, Hill, Robison & Belser and Hill, Hill, Whiting & Harris, Montgomery, for appellants.

John Patterson, Atty. Gen., J. Noel Baker and Robt. Bradley, Asst. Attys. Gen., for appellee.

**592**

White, Bradley, Arant, All & Rose, Birmingham, amici curiae, in support of appellee.

GOODWYN, Justice.

This is a suit brought in the circuit court of Montgomery County, in equity, by the State of Alabama, on the relation of the Attorney General of the State, against C. J. Larson and Virgil C. Moore, a partnership, doing business as Tide Finance Company, and C. J. Larson, Virgil C. Moore and M. R. Rice, individually. The bill seeks a temporary injunction enjoining and restraining respondents, "their servants, agents and employees, while acting within the line and scope of their employment, from making or entering into any contract or agreement whereby the rate of interest upon the loan or forbearance of money, goods, or things in action, exceeds the rate of $6.00 upon $100.00 for one year, or whereby the rate of interest by written contract exceeds the sum of $8.00 upon $100.00 for one year, or exceeds that rate for a greater or lesser sum or for a longer or shorter time, and on loan contracts and agreements presently in existence on which interest has been charged in excess of the lawful rate, to enjoin and restrain each of the respondents from filing suit thereon for more than the principal amount of the obligation with proper credit for all prior interest payments."

There is also a prayer that upon a final hearing the court "will issue a permanent injunction in accordance with the foregoing prayer for a temporary injunction, and in addition will declare that the acts of the respondents constitute a public nuisance against the citizens of the State of Alabama; that in consequence thereof the contracts taken and held by the respondents in violation of Title 9, Section 60, 1940 Code of Alabama, be declared null and void, and that each of said respondents, and their servants, agents and employees, be forever enjoined and restrained from carrying on and prosecuting their said business in violation of Title 9, Section 60, 1940 Code of Alabama, and from committing the acts as aforesaid which constitute a public nuisance", and will "appoint a receiver who shall be directed by this Honorable Court to examine, investigate and scrutinize each and every loan of record of each and every borrower whose name or names appear in the records kept by the said respondents; that the receiver determine if usurious interest has been charged upon said loan contracts, and determine the amount of usurious interest collected by the respondents upon each and every loan contract; that receiver be directed to deduct from the principal the usurious interest collected on each and every loan contract; further, that the receiver be directed to examine each and every contract made after the entry of the permanent injunction against the respondents to determine whether or not the respondents are charging a rate of interest in excess of that prescribed by law."

The bill also contains a prayer for general relief.

The material averments of the bill, as amended, are as follows:

That John Patterson is the duly qualified Attorney General of the State and as such brings the action in the name of and for the State; that respondents Larson and Moore are partners in the business known as Tide Finance Company, which maintains an office in the City of Montgomery; that respondent Rice is a resident of Montgomery and is manager of said business; that respondents "are engaged in the business of lending money for themselves and others in Montgomery County, Alabama, and have been so engaged for a period of 12 months next before the filing of this bill of complaint"; that respondents "have in the conduct of their business in said county during the 12 months preceding the

filing of the bill of complaint, and are now, deliberately, persistently, continuously and intentionally violating the laws of the State of Alabama and in particular Title 9, Section 60, 1940 Code of Alabama, which reads as follows:

" 'The rate of interest upon the loan or forbearance of money, goods or things in action, except by written contract, is six dollars upon one hundred dollars for one year, and the rate of interest by written contract is not to exceed eight dollars upon one hundred dollars for one year; and at that rate for a greater or less sum, or for a longer or shorter time';

that constantly and continuously, knowingly and deliberately, the respondents have loaned money to individuals in Montgomery County and exacted from them a rate of interest by written contract in excess of $8 upon $100 for one year; that in making loans in said county during the period of one year next preceding the filing of this bill of complaint the said respondents have charged or received and are now continuously and knowingly charging or receiving high and usurious rates of interest, which said rate of interest so charged or received is greatly in excess of the amount authorized by law to be charged, exacted or received for making such loans"; that respondents "in carrying on and engaging in their business as above set forth have used the courts of this State in enforcing and collecting usurious interest in violation of the provisions of Title 9, Sec. 65, 1940 Code of Alabama, which provides as follows:

" '§ 65. Interest on usurious contracts; recovery back of usury.—All contracts for the payment of interest upon the loan or forbearance of goods, money, things in action, or upon any contract whatever, at a higher rate than is prescribed in this chapter, are usurious, and cannot be enforced either at law or in equity, except as to the principal. Nor shall the borrower of money at a usurious rate of interest ever in any case in law or equity be required to pay more than the principal sum borrowed, and

if any interest has been paid the same must be deducted from the principal and judgment rendered for the balance only. Provided, however, that the defense of usury may not be pleaded against a holder of any negotiable instrument, in due course.' ";

that "the parties contracted with and sued by the respondents are largely ignorant and not advised of their legal rights and are not able to employ counsel to represent them; that the contracts of loan are prepared by the respondents and innocently or ignorantly executed by the borrowers and do not show on their face the usurious interest which is being charged; that because of the inability of the borrowers to retain legal counsel and by reason of their ignorance of the law and their legal rights, the borrowers allow judgments by default to be rendered against them in said actions; that in and by such judgments, in addition to obtaining a judgment for money to which they have no legal right in that proper credit for interest is not given and in and by such suits, the respondents obtain judgments for attorneys' fees greatly in excess of what would be a reasonable fee had the judgment been rendered for the principal amount of the indebtedness less the amount of interest paid thereon"; that "the State of Alabama in its sovereign capacity is interested in the protection of its citizens, particularly small wage earners, from invasions of their legal rights and from the illegal exaction or extortion of monies which such citizens are not legally required to pay" and "is also interested in preserving the courts of Montgomery County from an abuse of their processes on the part of said respondents in their attempt to use the courts of the County in the manner aforesaid for the purpose of collecting money under the aforedescribed contracts, which is not legally collectible; and the State is also interested that the courts of Montgomery County be so conducted that the trial disposition of legal and meritorious matters coming before said courts be not impeded or hampered, and that the practices of the respondents as described above be effectually restrained";

that respondents "will continue to violate the provisions of the statutes of Alabama set forth above and will continue to exact large sums of money as usurious interest, and will continue to institute * * * vexatious actions in the courts of Montgomery County for the purpose of attempting to enforce, and collect, usurious sums of money and interest, and that the processes of the courts of Montgomery County will continue to be abused by such actions unless restrained therefrom by order, judgment or decree of this Court"; that "it is the established public policy of the State of Alabama to protect the interest and welfare of its indigent and helpless citizens against the ravages of the respondents, and to protect the economic prosperity of its industrial areas, and to further the public faith in the integrity and impartiality of its courts of law; that the acts of the respondents as above described constitute a public nuisance to the citizens of the State of Alabama and will continue to be a public nuisance unless the practices of the respondents be effectually restrained."

The bill is sworn to by John Patterson, the Attorney General.

Upon filing the bill the cause was set down for hearing on the question of granting a temporary restraining order as prayed for. Code 1940, Tit. 7, §§ 1054–1055.

Prior to the hearing, Larson and Moore successively demurred to the bill, moved to strike from the bill certain "prolix and irrelevant allegations", moved to dismiss the bill, filed an amended demurrer to the bill as last amended, and answered the bill.

After the hearing the court rendered decrees denying the motion to strike and the motion to dismiss, overruling the amended demurrer to the bill as last amended, and granting the temporary injunction as prayed for. This appeal is from those decrees. However, the only decrees appealable are those overruling the demurrer (Code 1940, Tit. 7, § 755) and granting the temporary injunction (Code 1940, Tit. 7, § 1057). Accordingly, our consideration at this time will be limited to the appealable decrees. The rule is that "if no provision is made by law for an appeal from an interlocutory decree, such decree may not be assigned for error on an appeal from another interlocutory decree." Fogleman v. National Surety Co., 222 Ala. 265, 267, 132 So. 317, 319; Land v. Cooper, 244 Ala. 141, 142, 12 So.2d 410; Scott v. Leigeber, 245 Ala. 583, 585, 18 So. 2d 275; Reid v. Williams, 250 Ala. 602, 603, 35 So.2d 496; Dillard v. Gill, 254 Ala. 5, 6, 47 So.2d 203; Rush v. Newsom Exterminators, 261 Ala. 610, 614, 75 So.2d 112.

The part of the decree dealing with the temporary injunction is as follows:

"And the matter coming on further to be heard, is submitted upon the motion of the State for the temporary restraining order prayed for in the bill; upon the testimony taken orally before the Court in support of the motion, and the affidavits of the respondents in opposition thereto. Some seventeen witnesses for the State have testified orally in open court and three affidavits have been introduced by the State.

"The respondents, on their part, have submitted some forty-two affidavits, which have been filed in the cause and read to the Court; and the matter now being submitted for ruling on the State's motion for a temporary restraining order, the Court is of opinion that the order should issue as prayed for, and in so ruling the Court finds from the record now before it:

"That all the material and essential averments of the bill are sustained by the proof; and that the record before the Court shows clearly, and without real dispute, that the acts of the respondents complained of are unlawful; that they are against the ancient and established public policy of the State that usury is odious in law; that said Acts constitute a public nuisance with resulting injury to the public welfare and to all persons who come within the sphere of its operation.

"The Court finds thar (sic) during the period of time set forth in the bill, respondents have continuously and intentionally exacted unlawful interest from their borrowers, contrary to the usury laws of Alabama. It appears without dispute that every transaction between the lenders and their borrowers, testified about before the Court, are infected with the taint of usury from start to finish. The testimony proves, and there is no dispute as to this, that the rates of interest charged the borrowers by the respondents were unconscionable and exorbitant.

"It is shown by the uncontroverted evidence that the rate of interest charged by the lender and paid by one borrower was 700 per cent per annum. Another borrower was charged and paid 693 per cent per annum; another 624 per cent per annum; another 537 per cent per annum; yet another 480 per cent per annum, and another 416 per cent per annum. Interest charges ranging anywhere from 272 per cent per annum to 412 per cent per annum were everyday entries on the loan company's books.

"There is no doubt from the testimony that at all times mentioned in the bill the respondents were conducting their lending business in such a way as to deliberately and intentionally exact unlawful interest from their necessitous borrowers.

"The evidence also reasonably satisfies the Court that most of those who made loans from the lending company were in the lower-income brackets of life; were people of little education; some of them positively ignorant, and few of them had any idea whatever what the lawful rate of interest was in their own State, and most of them had only a faint conception, if any, what a promissory note was and what were the legal consequences affecting them when they signed one. All of the borrowers who testified had no assets except their earning power and could not obtain loans from the commercial banks.

"It is plain to the trial judge, after seeing the witnesses on the stand, watching their conduct and demeanor, and listening to their testimony in open court, that they are people who do not fully understand what their legal rights are. They are people who can be easily imposed upon.

"The manner in which the loan company conducted its business of lending small sums of money, ten to fifty dollars, to necessitous borrowers was certainly a nuisance to the public and their way of dealing with their customers has resulted in injury to the public welfare.

"The testimony shows that collectors of the company frequently made visits to the homes of their customers at unreasonable hours of the night, and generally long after usual business hours; that some of the borrowers would be called to the doors of their little homes in the midnight hours, or in the eerie hours before dawn, and have lights flashed in their faces and be confronted with imperative demands for the payment of unconscionable interest.

"It appears from the testimony of one witness that Company collectors came and took him from his job and brought him in a Company car to its office and required him to make a payment on his loan. The Court is convinced that this particular witness did not go with the agents of the Company voluntarily or with eagerness but went through fear and intimidation.

"It further appears that the testimony of some of the witnesses that collectors for the Company would come to their homes and when advised that the borrower was without money, would force him to draw a check on one of the local banks, when it was known to the collectors that the borrower did not have, and never did have any banking account. Suggestions were made to the borrower, if he would sign the check presented to him by the collectors he could pick it up the next day, or the day after, and if he did not then pay the check, it would be turned over to the 'sheriff of the county'.

"It appears from the testimony that threats of garnishment against the borrowers were frequently made; and there is testimony to the effect that in order to escape from being garnished, the borrower would quickly beat it to the debtors' court for relief. Approximately 70 per cent of the witnesses who testified at the trial were in the debtors' court. While there is a little testimony that the transactions with the loan company did not drive all of them into the federal debtors' court, the Court is convinced that the charging and collecting of unlawful interest, at extortionate rates as listed above was a materially contributing and powerful factor in the borrowers taking refuge in the federal debtors' court. Undoubtedly the manner in which the respondents conducted their business caused countless necessitous borrowers to go into the federal debtors' court or take advantage of the bankruptcy act.

"The evidence for the State shows,—and no witness was introduced by the loan company to deny this,—that calls upon the borrowers in their homes after bed-time at night were common, accompanied with threats to cart off the furniture of borrowers, and on one occasion to seize the furniture of a borrower's relative. Quite often the Company collectors came *en masse*. One borrower testified that three of them descended upon him (sic) home and family in the dark hours of the night and that one of his friends had to advance a two-dollar payment in order to be rid of the collectors. The borrower watched the proceedings from a safe distance in the shadows across the street.

"The testimony shows that, with perhaps one exception, every borrower applying for a loan was pressed by the need of money for the necessities of life. Sometimes loans were needed to pay past-due rent and prevent eviction; sometimes to provide food for the hungry family of the borrowers; to provide clothing; to pay for utilities; sometimes to pay doctors, medical and hospital bills, and funeral expenses. All through the testimony the proof runs that practically all of the borrowers were in needy financial condition, could not get loans from the regular banks and could get money only from a small loan company.

"The evidence for the loan company consists solely of affidavits. It and its co-defendants did not offer oral testimony. The Court has carefully considered each of the affidavits, has permitted respondents' counsel to read them in open court, and has read the affidavits itself. The affidavits are entitled to little, if any, weight. They are all of the same likeness and are drawn up in 'mass production.' They do not ring true. They do not speak the language of the type of borrowers who were customers of the loan company. There is hardly a sentence in any of the affidavits that represents the thoughts of the affiant—that is, are clothed in the words customarily used by the affiants.

"Phrases used such as these are the phrases of company agents or legal advisors; 'immediately preceding the execution', etc; 'completed all contract arrangements', etc.; 'the money was urgently needed', etc.; 'to meet an indebtedness incurred', etc.; 'I am proud to have done business', etc.; 'I am at the present time indebted', etc. These phrases are not the words and phrases of small wage earners, of people with the limited education stated by the borrowers in their affidavits—these are the words and phrases of men familiar with the complexities of the money lending business and with legal terminology. They are not the words usually found in the vocabularies of mechanics' helpers, cooks, housemaids, day-laborers, janitors, cowdrivers, and small tenant farmers, and people following like lines of work who are the affiants here.

"More than fifty per cent of the affidavits sworn to before the same notary contain this paragraph word for word, only the amount varying:

" 'Mr. Mathis of Tide Finance Company has always been very courteous to me and he has never threatened me with harass-

ment, bodily harm or legal action in connection with any of the loans. On the contrary, I have at all times been rendered courteous service and I am proud to have done business with the Tide Finance Company. No one forces me to borrow money from this Company and I do not borrow any more than is necessary for me to meet my debts. I repay my loan to the company in payments of $4.00 every other week.'

"The Court is impressed, after hearing all the evidence in this case, with the fact that the loan company has conducted its lending business with studied contempt for our usury laws; and has conducted its business in such manner as not only to affect its borrowers, but also to affect all the people who have come within the range of its operations. Their business methods have created a public nuisance by their charging and collecting unlawful and unconscionable interest from their more than 1050 customers; the visits in the dead of night, of their collectors; their threats against borrowers; their forcing them to sign blank checks on banks in which they had neither accounts nor money, and making them subject to the pains and penalties of the criminal laws,—these things are a public nuisance.

"These actions, and others proved by the evidence in this case, present an evil and repulsive picture of oppression and intimidation; of the exaction from lowly and humble folk of unconscionable and extortionate rates of interest on small loans; of intentional flouting of the wise public policy of the State; of taking unlawful advantage of the necessities of financially distressed people, pictures which in their ugliness are hardly shown by any other record found in the books and files of this court.

"This court of equity in the face of the odious conditions shown by the record in this case would be unworthy of its ancient title, 'a court of conscience', if it stood idly by and failed now to use its restraining and injunctive powers to stop the oppressive practices of the loan company shown by this record.

"The restraining order prayed for by the State cannot in equity and good conscience, in the interest of the public welfare, be denied. The Register will enroll the following decree:

"This matter now coming on to be heard, is submitted by the parties upon the motion of the complainant for a temporary restraining order against the respondents, upon the pleadings and proof, and upon the testimony taken orally before the Court, and upon the affidavits offered in evidence by the respective parties, and upon a consideration of the same, the Court is of opinion that the temporary restraining order prayed for should issue. It is, therefore,

"Ordered, Adjudged and Decreed by the Court that each of the defendants to this suit, their agents, servants and employees, while acting in the line and scope of their duties, are enjoined and restrained from making or entering into any oral contract or agreement, whereby the rate of interest upon the loan or forbearance of money, goods, or things in action, exceeds the rate of six dollars upon one hundred dollars for one year, or whereby the rate of interest by written contract exceeds the sum of eight dollars upon one hundred dollars for one year, or exceeds that rate for a greater or lesser sum or for a longer or shorter time; and, on loans and contracts presently in existence on which interest has been charged in excess of the lawful rate, the said respondents, and each of them, their servants, agents or employes while acting in the line and scope of their employment, are enjoined and restrained from filing suit thereon for more than the principal amount of the obligation, with proper credit given for all prior interest payments.

"All other questions reserved."

█ It is apparent from reading the bill that relief is not sought on the basis of appellants' collection methods but main-

ly on the grounds that appellants have been, and are now, deliberately, persistently, continuously and intentionally violating the usury statutes of Alabama in lending money to necessitous borrowers who "are largely ignorant and not advised of their legal rights and are not able to employ counsel to represent them", and that appellants are using the courts of this state in enforcing collection of such usurious interest. In this connection, it is to be noted that a good part of the trial court's findings deals with appellants' collection methods although there is no allegation with respect thereto. It appears to be established by the evidence that those allegations charging violations of the usury statutes are true. However, the allegations with respect to appellants' use of the state's courts in enforcing collection of such usurious interest are not sustained by the evidence; nor is there any finding by the trial court with respect thereto.

■ In this posture of the case the principal question presented at this time, as we see it, is whether a lender of money who deliberately, persistently, continuously and intentionally charges highly usurious rates of interest on short term small loans made to necessitous borrowers who "are largely ignorant and not advised of their legal rights and are not able to employ counsel to represent them", may be enjoined from so doing. The answer to this question depends upon whether such acts are violative of the established public policy of this state and constitute a public wrong or nuisance subject to abatement by injunctive process.

In State ex rel. Embry v. Bynum, 1942, 243 Ala. 138, 9 So.2d 134, this court unquestionably approved the proposition that the operations of a loan company, engaged in the business of habitually and persistently making short term small loans at highly usurious rates of interest to a class of ignorant, necessitous borrowers who are unable to assert theirs rights effectively, can constitute a public wrong or nuisance subject to abatement by injunction. Such

holding finds support in decisions from several other jurisdictions, although there is authority supportive of a contrary holding. For cases supportive of the holding in Bynum see: State ex rel. Beck v. Associates Discount Corporation, 1956, 162 Neb. 683, 77 N.W.2d 215; State ex rel. Moore v. Gillian, 1940, 141 Fla. 707, 193 So. 751; State ex rel. Goff v. O'Neil, 1939, 205 Minn. 366, 286 N.W. 316; Commonwealth ex rel. Grauman v. Continental Co., 1938, 275 Ky. 238, 121 S.W.2d 49; State ex rel. Beck v. Basham, 1937, 146 Kan. 181, 70 P.2d 24; State ex rel. Smith v. McMahon, 1929, 128 Kan. 772, 280 P. 906, 66 A.L.R. 1072. For cases supportive of a contrary holding see: State ex rel. Boykin v. Ball Investment Co., 1940, 191 Ga. 382, 12 S.E.2d 574; Ex parte Hughes, 1939, 133 Tex. 505, 129 S.W.2d 270; Means v. State, Tex.Civ.App. 1934, 75 S.W.2d 953; Commonwealth v. Stratton Finance Co., 1941, 310 Mass. 469, 38 N.E. 2d 640; People v. Seccombe, 1930, 103 Cal. App. 306, 284 P. 725.

In State ex rel. Embry v. Bynum, supra [243 Ala. 138, 9 So.2d 139], it is said as follows:

"The public policy of this State condemns usurious contracts as 'tainted with an evil * * * intent' Barclift v. Fields, 145 Ala. 264, 41 So. 84, 85 and 'offensive to the policy and positive mandate of the law.' Hawkins v. Pearson, 96 Ala. 369, 11 So. 304; McCormick v. Fallier et al., 223 Ala. 80, 134 So. 471. This public policy is supported by Divine Authority, Exodus, Ch. 22, V. 25, and the common law. * * *

* * * * * *

"* * * The right of the state to injunctions to protect its established public policy is sustained in Commonwealth [ex rel. Grauman] v. Continental Co., 275 Ky. 238, 121 S.W.2d 49; State [ex rel. Moore] v. Gillian, 141 Fla. 707, 193 So. 751; State ex rel. Goff v. O'Neil, 205 Minn. 366, 286 N.W. 316, and in principle by our case Try-Me Bottling Co. et al. v. State, 235 Ala. 207, 178 So. 231.

* * * * * *

"Our conclusion, therefore, is that the state in pursuance of its established public policy in protecting the interest of its indigent and helpless citizens against the ravages of the loan shark pest, the economic prosperity of its industrial areas, the furtherance of the public faith in the integrity and impartiality of its law courts, in the administration of justice therein, may invoke the aid of its courts of equity to enjoin the unlawful practices of the defendants as a public nuisance, restrain and enjoin them from proceeding in the law courts to enforce said void contracts, and keep them in subjugation to the law." From State ex rel. Beck v. Associates Discount Corporation, supra [162 Neb. 683, 77 N.W.2d 229], (decided after the Bynum Case), is the following:

"The disastrous effects of usury are universally recognized and in every jurisdiction the state has, as a matter of public policy, enacted some measure of protection for its people from the harsh result and injury to them arising from unconscionable and unlawful exactions for the use of money imposed upon its residents, many of whom are obscure, economically distressed, and unable to protect themselves. The state itself, represented by the Attorney General, has therefore of necessity, in order to protect its people and prevent public wrongs, emerged as the proper party whose duty it is to represent all the public in defense of the state's own sovereignty and bring such actions as that at bar. In doing so, courts have generally recognized the state's right to the equitable remedies of injunction and receivership as a proper and effective method of controlling unlawful lenders under statutes comparable with our own. * * *"

The Supreme Court of Minnesota, in State ex rel. Goff v. O'Neil, supra [205 Minn. 366, 286 N.W. 318], relied on in Bynum, had this to say:

"The next proposition is, Does the complaint state a cause of action for injunctive relief? It is conceded that our statutes forbidding the taking of usury do not subject the transgressor to a penalty by way of imprisonment or fine. So there is no remedy for usury under the criminal law. The plaintiff contends that the business of usury as carried on by defendant is in the nature of a public nuisance and as such may properly be enjoined. * * * As stated, usury, by our statute, is not made a crime, so the state may not put a stop to the practice by criminal prosecution. However our usury legislation clearly establishes the policy of the state outlawing the taking of usury. It is forbidden. Why? In the interest of public welfare, to protect the helpless and the poor, always present in every community, from the rapacity of the money lenders who exact usury. On principle, where there is no adequate remedy either by criminal law or by the ordinary civil suit, equity may properly come to the rescue by appropriate injunctive relief. * * *

\* \* \* \* \* \*

"In opposition defendant cites People v. Seccombe, 103 Cal.App. 306, 284 P. 725. There a demurrer to the complaint in a suit for injunction against a usurer was sustained, because no sufficient facts were alleged, but mere conclusions of law. In the case of Means v. State, 75 S.W.2d 953, 954, Court of Civil Appeals, Texas, a temporary injunction was vacated on appeal. The state filed no brief. The action was to enjoin Means from operating as a loan broker or money lender in the county because he had not been licensed as such, as the Texas law required. It was also alleged that Means collected usurious interest on the money loaned. On the appeal it was held that there was no evidence that Means was a loan broker or money lender of the sort that was required to be licensed, and the court said: 'Contracts for the payment of usurious interest are void. The offended individual has his remedy by suit against the lender for recovery of double the amount of the usurious interest paid. See article 5073, R.S.1925. Whether in the future the state shall be empowered to enjoin the business of money lending at usurious rates of interest under the conditions here shown addresses itself to the sound consideration

of the Legislature.' Neither case presents the same situation as that stated in the complaint in the instant case. It appears from this complaint that the remedy available to defendant's victims is ineffective to stop the practice. They have not the means to employ a lawyer. The amounts involved are so small that to seek to recover what has been illegally extorted or defend against the obligation given for the loan would cost more than the amounts involved, besides the loss of time and the annoyance of litigation. Unless the state may enjoin a business in which every transaction is a flagrant violation of the usury law enacted for the protection of the many necessitous borrowers of trifling amounts, there is no effective remedy for the enforcement of the law. Injunction has been resorted to in respect to repeated and persistent infractions of other laws than those forbidding usury. (Citing cases) * * *

* * * * * *

"No danger is to be apprehended that courts will grant injunctive relief against violators of statutes where there is an adequate remedy at law. In the case at bar there is no remedy by fine or by imprisonment; and, even were there such, the nature of defendant's business is such that the remedy given his victims for the usury exacted is ineffective because of their helplessness and inability to make use thereof."

From the Kansas case of State ex rel. Beck v. Basham, supra [146 Kan. 181, 70 P.2d 25], cited with approval in the Bynum Case, is the following:

"It has become the public policy of this state to limit interest rates. This is deemed prudent and necessary to prevent grasping persons from taking undue advantage of those in need of money, many times to their financial ruin and to the detriment of our people as a whole. * * *

"The evidence clearly shows, and the court found, that defendant is in the business of violating these statutes. * * *

"On his behalf it is conceded, in effect, that defendant is conducting a business in flagrant violation of our valid statutes and in violation of the long-time, well-settled public policy of this state, but appellee contends that nothing can be done about it for two reasons: (1) Because the statute does not make the charge of usury a crime and fix a penalty therefor. This point was considered in State ex rel. [Beck] v. McMahon, supra, and held not to be a bar to an action for injunction by the state. Indeed, the fact a criminal action cannot be maintained makes injunction all the more appropriate, since the state does not have that remedy for the enforcement of the statute. (2) It is contended that defendant has not conducted his business in such an offensive manner as to amount to a nuisance, as was the case alleged in State ex rel. [Beck] v. McMahon, supra. This argument appears to be predicated upon the view that statutes of this state designed for the public good and evidencing long-continued public policy may be openly and notoriously violated with impunity so long as the violator is pleasant or gracious in his manner of violating the statute. * * *

"Much is said in the briefs of appellee about the conduct of defendant not amounting to a nuisance. That term has been many times defined, perhaps sometimes with too much refinement. We are not convinced defendant's conduct has to be characterized as a nuisance before it can be enjoined, but if so, there is authority so denominating it. In State ex rel. [Vance] v. Crawford, 28 Kan. 726, 733, 42 Am.Rep. 182, it was said: 'The repeated, continuous and persistent violations of the statutes, are what makes then nuisances.' This the defendant, by his own testimony, establishes that he has done and is doing. In State v. Rabinowitz, 85 Kan. 841, 847, 118 P. 1040, 1042, 39 L.R.A.,N.S., 187, it was said: 'At the common law acts done in violation of the law, or which are against good morals or public decency, and

which result in injury to the public, constitute a public nuisance.

\* \* \* \* \* \*

"It is fundamental that courts are open to the state for an action either in its sovereign capacity or as a corporate entity. (59 C.J. 299.) The sovereignty of a state embraces the power to execute its law. The state, on the relation of the Attorney General, may maintain an action to enjoin the flagrant violation of its law. See, State ex rel. [Beck] v. McMahon, supra. \* \* \*

\* \* \* \* \* \*

"There is no reason defendant should be permitted openly, notoriously, and flagrantly to violate our valid laws enacted for the benefit of our people. The state would be weak indeed if it were powerless to prevent it. Criminal prosecution is not available. Injunction is the only remedy. That remedy can be and should be enforced. \* \* \*"

From another Kansas case, State ex rel. Smith v. McMahon, supra [128 Kan. 772, 280 P. 907], also cited with approval in the Bynum Case, we quote the following:

" \* \* \* Has the law no adequate preventive for such a deplorable condition of affairs? Counsel for defendants answer with a confident negative. He says there is for each of the hundreds of borrowers a plain and adequate remedy at law, and that the exaction of usurious interest is of no concern of third parties, not even of the state itself. Is that so? We have a statute which limits the contract rate of interest to 10 per cent. per annum. This statute provides that any person who contracts for a greater rate of interest than 10 per cent per annum shall forfeit the excess; and in addition thereto shall forfeit a sum of money to be deducted from the amount due for principal and lawful interest equal to the amount of interest contracted for in excess of 10 per cent. per annum. R.S. 41–102.

"But according to plaintiff's allegations, the truth of which is conceded by the demurrers, this statute is systematically set at naught by the defendants. Between money lender and borrower, of course it is altogether ineffective until invoked in some lawsuit. And according to the plaintiff's allegations such a lawsuit will not arise once in every hundred times the usurious toll is taken from the wages of his victim. The wage-earner has no time to attend court nor means to employ a lawyer to invoke the defense to the usurer's claim accorded by this statute. He must earn wages every working day to support his family. If garnishment proceedings are instituted which will bring his employer into court on matters of no concern to that employer, the unfortunate debtor is discharged. This dread consequence to the debtor can only be avoided by continued submission to defendants' usurious exactions.

"It is undeniable that many an isolated oppression is practiced on a debtor by an exacting creditor for which the law furnishes no practical relief. In the situation portrayed by plaintiff, it is perfectly obvious that for the hundreds of indigent debtors held in financial peonage by defendants the remedy supplied by law is pitifully inadequate; and the ruling in Pritchett v. Mitchell, 17 Kan. 355, 22 Am.Rep. 287, that the exaction of usury is a mere contractual matter of no concern to anybody but the parties themselves is imperatively in need of revision in the light of the complex social and economic conditions brought about by the industrial development in the half century since that doctrine was announced. The long-continued subjection of hundreds of indigent debtors to the usurious exactions of defendants by keeping them in fear of losing their jobs if they should have the temerity to assert the rights accorded them by the beneficent statutes of this commonwealth presents a situation which cannot be tolerated, and one which quite justifies the institution of this litigation by the state itself. In the State ex rel. v. Howat, 109 Kan. 376, 198 P. 686, 25 A.L.R. 1210, where the right of the state to initiate litigation

over matters primarily of private concern but secondarily of far-reaching consequence to the public was thoroughly discussed, an excerpt appears from the Supreme Court of Illinois worth repeating here:

" ' "It is one of the most useful functions of a court of equity that it may give complete and adequate relief against acts which will constitute nuisances. * * *

" ' " * * * The public authorities have a right to institute the suit where the general public welfare demands it and damages to the public are not susceptible of computation. The maintenance of the public health, morals, safety, and welfare is on a plane above mere pecuniary damage, although not susceptible of measurement in money, and to say that a court of equity may not enjoin a public nuisance because property rights are not involved would be to say that the state is unable to enforce the law or protect its citizens from public wrongs." [Stead v. Fortner] 255 Ill. 474–477, 99 N.E. 683.' Pages 387, 388, of 109 Kan., 198 P. 691, 692.

"The same principle was well stated in the case of In re Debs, Petitioner, 158 U.S. 564, page 586, 15 S.Ct. 900, 907, 39 L.Ed. 1092, where it was said:

" 'It is obvious from these decisions that while it is not the province of the government to interfere in any mere matter of private controversy between individuals or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the constitution are entrusted to the care of the nation, and concerning which the nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties.'

"The courts are not helpless to put a stop to such a nefarious business as that of which plaintiff complains when that business has reached the widespread prevalence it has attained in the principal industrial communities of the state. What in any case is the justification for equitable interference with the multifarious doings of men but the natural reaction of the judicial conscience towards some peculiar evil for which the law by reason of its universality is inadequate to correct? From the foundation of our commonwealth it has been a matter of civic pride that one of this state's primary concerns has been that the poor man shall have a fair chance to better his material condition. To that end we have made the family homestead immune to judicial process in invitum. The household goods of the family, the tools of the workman, and the needful agricultural chattels of the husbandman are generously exempted from execution sale. R.S. 60–3501 et seq. So, too, 90 per cent. of the current wages of a laborer who is the head of a family are protected from garnishment as prescribed in R.S. 60–3495. * * *

, * * * * * *

"Precedents for the particular form of redress sought by plaintiff to suppress the evil complained of are rare, but in State ·v. Martin, 77 N.J.L. 652, 73 A. 548, 24 L.R.A., N.S., 507, 134 Am.St.Rep. 814, 18 Ann.Cas. 986, the New Jersey Court of Errors and Appeals went a good deal further than we are asked to do in these cases. It held that, although the taking of usurious interest was not a criminal offense in New Jersey, yet interest in excess of 6 per cent. per annum being forbidden under a civil penalty, a loan office where the exaction of such usurious interest was systematically practiced was a disorderly house, for the maintenance of which the usurer could be indicted and punished. In the opinion the court said:

" 'The title of our statute is "An Act against usury." 3 Gen.Stat. 1895, p. 3703. The provision of its first section is "that no person or corporation shall, upon con-

tract, take directly or indirectly, for loan of any money, wares, merchandise, goods and chattels, above the value of $6 for the forbearance of $100 for a year, and after that rate for a greater or less sum or for longer or shorter time." The object disclosed in the title of the act is the prevention of usury; the method by which the legislature provides for the carrying of that object into effect is by enacting an express prohibition against taking it. Counsel argues that a violation of this mandate of the statute by a person loaning money does not constitute an unlawful act, first, for the reason that the statute imposes no penalty upon him for so doing. * * *

" 'The statement that the statute does not impose any penalty upon a person who takes usury is not accurate; for the second section of the act deprives him of the power to enforce the payment of any interest on his loan, and entitles the borrower to have the amount of the usury deducted from the principal of the loan in case usury has been paid. * * * The fact that the statute imposes no penalty, except the deprivation of the money which the statute prohibits the lender from taking, affords no ground for holding that the taking of usury is not unlawful.' Pages 653, 654, of 77 N.J.L., 73 A. 549.

\* \* \* \* \* \*

"It will thus be seen that the exaction of usurious interest has been denounced as unlawful and penalized by our Legislature although it is not one of the specific offenses enumerated in our Crimes Act. It is not only illegal, but it is a grievous antisocial iniquity (Marshall v. Beeler, 104 Kan. 32, 178 P. 245), and, when its practice assumes the proportions and prevalence alleged by the plaintiff, a court of equity should not hesitate to suppress it.

\* \* \* \* \* \*

" \* \* \* The Kansas statute does prohibit usury and does prescribe penalties (civil penalties inuring to the debtor), and, the practice of usury being unlawful in this state, upon sufficient aggravation it may be suppressed by injunction."

We do not understand appellants to question the decision in the Bynum case. Rather, in their argument they seek to distinguish that case from the case at bar on the grounds that the facts are dissimilar and that the status of the law has changed since the Bynum decision.

In their very able brief appellants analyze the allegations of the bill in the Bynum case in great detail to demonstrate the differences in the factual situation there and the factual situation presented by the pleadings and proof in the case at bar. While there are differences, it should be borne in mind that the question here is whether the principles laid down and approved in the Bynum case are applicable to the case now before us. The dissimilarity in some of the facts is not necessarily controlling.

The principal distinction drawn by appellants is that the allegations of the bill in the Bynum case show that the loan companies there had used the courts to enforce collection of void usurious loan contracts and in so doing had clogged the courts' dockets, while in the case at bar the loan contracts are not void and there is no evidence that the defendants have so used the courts. Appellants' view is that in the Bynum case it was the loan companies' abuse of the courts in the respect indicated which rendered the companies' operations a public nuisance and not the persistent exaction of usurious interest from necessitous borrowers who were unable to assert their rights effectively.

With this we are unable to agree. The basic activity which the court condemned as a public nuisance was the habitual and persistent exaction of usurious interest from a class of borrowers who were helpless to assert their rights. It seems to us that this is made clear from a consideration of the opinion itself and the cases

there relied on. Although the aggravation of the defendants' activity by their abuse of the courts was censured in the opinion, we do not think such abuse was the underlying basis for the court's conclusion that the defendants' operations constituted a public nuisance.

■ Appellants' next argument is that equity should decline jurisdiction of this case because the state now has an adequate remedy at law which was not available at the time the Bynum case was decided. The insistence is that the state now has a full and adequate remedy at law for combatting any illegal operations of small loan companies by virtue of the provisions of the Harris Act, originally enacted in 1945 and last amended in 1951 (Act No. 159, appvd. June 23, 1945, Gen. Acts 1945, p. 200; Act No. 787 appvd. Sept. 11, 1951, p. 1385; Code 1940, Tit. 5, §§ 263–275, Pocket Part).

The Harris Act was enacted for the purpose of licensing those engaged in the small loan business and providing a measure of supervision over the activities of those so engaged. The Act contains a number of provisions regulating the conduct of such business but the charging of usurious interest is not specifically forbidden. To administer the provisions of the Act, a bureau of small loans, headed by a supervisor, was created (§ 267). The last section of the Act specifies that the violation of any of its provisions shall be a misdemeanor (§ 275). As a further means of enforcing its provisions the Act provides: "The supervisor may, either before or after the suspension or revocation of any license, apply to any court of competent jurisdiction for an injunction or other order enjoining or prohibiting any person from violating any of the provisions of this chapter or any rules, regulations or orders of the bureau, and upon a proper showing the court shall issue such injunction or order as may be deemed proper" (§ 267).

Appellants insist that the state has an adequate means of policing the small loan companies through the action of the bureau of small loans and has no need to resort to a suit in equity for injunctive relief. The fallacy of this argument appears from a careful reading of the Harris Act itself. As already noted, none of its provisions specifically forbids the charging of usury. Section 275 provides as follows: "The charging of interest at an interest rate in excess of eight percent (8%) per annum shall not be deemed to be a criminal offense but nothing contained in this chapter shall be construed as legalizing the charging of interest at a rate in excess of eight percent (8%) per annum."

The activity which is sought to be enjoined in this case is the habitual and persistent exaction of usury from a class of borrowers who are unable to assert their rights effectively. This type of activity is not in itself violative of the provisions of the Harris Act, and the sanctions of the Act cannot be used to suppress it. It is our conclusion, therefore, that the state does not have an adequate remedy at law under the provisions of the Harris Act so as to prevent resort to equity for relief in this case.

■ The decree provides that "on loans and contracts presently in existence on which interest has been charged in excess of the lawful rate, the said respondents * * * are enjoined and restrained from filing suit thereon for more than the principal amount of the obligation, with proper credit given for all prior interest payments." The undoubted meaning of "proper credit" is that "if any interest has been paid the same must be deducted from the principal and judgment rendered for the balance only", as provided in § 65, Tit. 9, Code 1940, supra. It seems to us that if the equity court has the power to abate by injunction the operations of a loan company engaged in habitually and persistently making short term small loans at highly usurious rates of interest to a class of ignorant, necessitous borrowers who are unable to assert their rights effectively, a

necessary adjunct thereto, in order to do complete justice, is the power to prohibit the loan company from using the courts of this state in collecting "more than the principal amount of the obligation, with proper credit given for all prior interest payments." The obvious effect of this restraint is to invoke, on behalf of the stated class of borrowers, the prescription of § 65, Tit. 9, Code 1940, supra, that if any usurious interest has been paid it "must be deducted from the principal and judgment rendered for the balance."

With reference to the authority of the Attorney-General to bring this suit, we quote the following from appellants' brief:

"The Governor of Alabama, in whom is vested the supreme executive power of the State, has the constitutional responsibility to take care that the laws of the State be faithfully executed, and the Attorney General of Alabama is without authority to institute and prosecute, in the name of the State, suits and other proceedings at law or in equity contrary to and in direct violation of the orders of the Governor.

"The Constitution of the State of Alabama provides for the creation of an executive department, to consist, among others, of a Governor and an Attorney General. Art. 5, Sec. 112, Ala.Const.1901. The supreme executive power of the State is vested by our Constitution in the Governor, art. 5, Sec. 113, Ala.Const.1901, and to the Governor alone is delegated the power and responsibility to take care that the laws be faithfully executed. Art. 5, Sec. 120, Ala. Const.1901.

"The Legislature has authorized the Attorney General to institute and prosecute, in the name of the State, all suits and other proceedings in law or in equity necessary to protect the rights and interests of the State. Tit. 55, Sec. 229, Ala.Code 1940. The Legislature has further specified that all litigation concerning the interest of the State shall be under the direction and control of the Attorney General. Tit. 55, Sec. 244, Ala.Code 1940. There is, of course, consti-

tutional authority for this power, since our Constitution provides that the Attorney General shall perform such duties as may be prescribed by law, art. 5, Sec. 137, Ala. Const.1901; and the constitutionality of the foregoing Code sections has been upheld in cases in which the point was specially raised by demurrer that the Attorney General was without authority to institute the proceedings since, for aught that appeared, he acted without the direction or consent of the Governor. Try-Me Bottling Co. v. State, 235 Ala. 207, 178 So. 231; Montgomery v. Sparks, 225 Ala. 343, 142 So. 769; McDowell v. State, 243 Ala. 87, 8 So.2d 569; State ex rel. Carmichael v. Jones, 252 Ala. 479, 41 So.2d 280.

"We do not here contend that it is necessary for the Attorney General to allege that he is authorized by the Governor to institute suits, nor do we raise the issue as to whether the Attorney General, under our Constitution, is empowered to institute suits without the consent or authority of the Governor; however, we respectfully urge that under our Constitution the Governor is the chief law enforcement officer, has vested in him the supreme executive power of the State, and has the constitutional responsibility to take care that the laws of the State be faithfully executed, so that the Attorney General of Alabama is without authority to institute and prosecute suits in the name of the State contrary to and in direct violation of the orders of the Governor; and to the extent that they might purport to authorize such action by the Attorney General, Tit. 55, Sec. 229, Ala.Code 1940, and Tit. 55, Sec. 244, Ala.Code 1940, would be unconstitutional. Board of Revenue of Jefferson County v. State, 172 Ala. 138, 54 So. 757; Parke v. Bradley, 204 Ala. 455, 86 So. 28; art. 5, secs. 112, 113, 120, and 121, Ala.Const. 1901.

"The appellants moved to dismiss the bill of complaint and demurred to the bill of complaint on the ground that, for aught that appeared, the Attorney General acted contrary to and in direct violation of the orders

of the Governor in instituting this action. * * *"

At the present stage of the case we are not called upon to decide the specific point raised. Appellants apparently agree that the Attorney-General is authorized to bring the suit unless he has acted "contrary to and in direct violation of the orders of the Governor." Assuming, without deciding, that the suit cannot be maintained if such orders are given, we see no necessity of the bill negating such action by the Governor.

The decrees overruling the amended demurrer to the bill as last amended and granting the temporary injunction are due to be affirmed.

Affirmed.

SIMPSON, STAKELY, MERRILL and COLEMAN, JJ., concur.

LIVINGSTON, C. J., and LAWSON, J., concur specially.

LIVINGSTON, Chief Justice, and LAWSON, Justice (specially concurring).

We agree with the holding of the court to the effect that the demurrer was overruled without error. We are also in agreement with the court's action in upholding the temporary injunction ordered by the trial court. However, our agreement on this phase of the case is grounded on the belief that the proof shows that the overall manner in which appellants have conducted their business constitutes a public nuisance subject to being enjoined by the equity courts of this state in a suit instituted on behalf of the State at the instance of the Attorney General.

We do not understand the court to hold that the charging and collection of interest in an amount in excess of that provided by law, standing alone, is sufficient to constitute a public nuisance subject to injunctive relief.