COMMONWEALTH *vs.* STRATTON FINANCE COMPANY
& another.

Suffolk.    November 12, 1940. — December 31, 1941.

Present: FIELD, C.J., DONAHUE, QUA, & DOLAN, JJ.

*Equity Jurisdiction*, Criminal acts.    *Small Loans.*

In this Commonwealth there is no equity jurisdiction for the maintenance of a suit by the Commonwealth seeking that certain defendants, alleged to be operating a "loan shark business," be enjoined from habitual and continuous violations of the provisions of § 96 of G. L. (Ter. Ed.) c. 140, as amended, that it be declared that all loans by them violating those provisions be declared void and that they be enjoined from collecting them, although in the circumstances the defendants' business be "offensive, detrimental and injurious to the life, health and general welfare of the borrowers and their families" and "contrary to the good morals, public peace and general welfare of the people and contrary to the public policy of the Commonwealth."

BILL IN EQUITY, filed in the Superior Court on November 2, 1939.

A demurrer was overruled by *Greenhalge*, J., and the case was reported to this court.

*M. H. Goldman*, for the defendants.

*M. M. Goldman*, Assistant Attorney General, for the Commonwealth.

QUA, J.    The Commonwealth brings this bill in equity in its own name.    The bill is long, but for the purposes of this opinion it may be summarized as alleging these facts:    The defendants have engaged in the "loan shark business." They "keep and maintain a public nuisance . . . and are engaged in habitually, continuously, repeatedly, openly, publicly, persistently, and intentionally" violating the statutes regulating the business of making small loans to the injury of the public.    They maintain an office in Boston. They make loans of $300 or less on which the interest and expenses far exceed the amount permitted by law to be charged.    Although not licensed, they are engaged in the

business of making such loans at rates far in excess of the twelve per cent per annum allowed to unlicensed lenders by G. L. (Ter. Ed.) c. 140, § 96, as amended. Their rates range as high as one hundred forty-one per cent per annum. They purposely select for their customers poor and necessitous wage earners. For the most part these borrowers are employees of department stores and of corporations which very often frown upon their employees becoming involved in debt. The borrowers are compelled to continue to pay such excessive interest through fear of losing their employment as the result of the defendants' attachments of their wages and threats to attach them. By reason of the defendants harassing the borrowers and disturbing their peace of mind by sending them letters through the mails and otherwise, they agree to pay such loans, including such unconscionable, exorbitant and unlawful interest. The defendants in most instances require the borrower to execute a note for an amount grossly in excess of the actual loan. They "are experienced in the chicanery by which illegal and unenforceable loan contracts and agreements are actually collected, and in the means by which an aura of legality is thrown about these devices in order to evade" the law, so that "such borrowers can seldom extricate themselves from debt and must continue to pay such excessive and unlawful interest until the borrower dies, loses his means of livelihood, or is forced" into bankruptcy. The great majority of such borrowers are wholly dependent upon their wages and salaries for the support of themselves and their families and live in constant apprehension of anything that menaces their means of livelihood. The excessive and unconscionable interest exacted by the defendants is a heavy and constant drain upon the incomes of the borrowers and deprives them of the necessities of life. The defendants arrange with automobile dealers for exorbitant finance charges upon purchasers of automobiles. Frequently the dealer does not exhibit the printed rate card to the purchaser, but arbitrarily sets a finance charge higher than the printed charge, dependent upon what the dealer believes the unwary purchaser will pay, the excess

being divided between the dealer and the defendant company, thereby creating a loan at a rate of interest far in excess of that permitted by the small loans law. The defendants' business "is offensive, detrimental and injurious to the life, health and general welfare of the borrowers and their families," in that it diverts a large per cent of the borrowers' incomes from "otherwise beneficial directions," and materially reduces their ability to obtain the social and economic benefits which their incomes would normally secure to them. Said activities breed strife and unrest and cause the borrower in his extremity to go to others engaged in the same unlawful activities, further depriving himself and his family of the necessities of life and resulting in emotional and mental distress affecting the borrower's performance as an employee and adding to the relief rolls. Said business is obnoxious and detrimental to retailers of goods who serve the borrowers and their families because the excessive interest reduces the sum available to pay for supplies furnished. Because of these effects on many hundreds of persons the defendants' activities are contrary to the good morals, public peace and general welfare of the people and contrary to the public policy of the Commonwealth. The majority of the borrowers are humble citizens, ignorant of the law, and their legal rights against the defendants are inadequate and ineffective. They have no means to defend themselves. There is thus presented, the bill alleges, "an intolerable situation" that cannot be remedied, except by relief in equity.

The prayers are that the defendants be enjoined from violating the interest provisions of G. L. (Ter. Ed.) c. 140, § 96, as amended; that all loans made in violation of the law be declared void; and that the defendants be enjoined from collecting them.

General Laws (Ter. Ed.), c. 140, § 96, as amended, provides in part that "No person shall directly or indirectly engage in the business of making loans of three hundred dollars or less, if the amount to be paid on any such loan for interest and expenses exceeds in the aggregate an amount equivalent to twelve per cent per annum upon the sum loaned," without

first obtaining from the commissioner of banks a license to carry on the said business. Section 106 provides, in effect, that if a greater rate of interest than is allowed has been paid on any such loan the person who paid it may file a complaint with the commissioner, who may order the excess refunded, or may make such other order as he may deem necessary. Sections 103 and 110 impose penalties which include a fine not exceeding $500 for any violation of § 96 or of any order of the commissioner, and also imprisonment for not more than two months for carrying on without a license the business of making the loans to which § 96 applies; and the fact that a defendant has made or assisted in making two or more loans of $300 or less upon which the charges exceed twelve per cent is made prima facie evidence of engaging in such business. These sections also contain a provision under which loans carrying a higher interest rate than that allowed may be declared void upon the petition in equity of the borrower (§ 103) and a provision rendering wholly void any loan by an unlicensed person in violation of the statute (§ 110). *Cuneo* v. *Bornstein*, 269 Mass. 232.

The plain object of this suit is to enforce a criminal statute by injunction. No citation of cases is needed to demonstrate that this lies outside the ordinary course of equity jurisdiction with which we are familiar in this Commonwealth. The plaintiff in its brief, however, has cited a great many cases from other jurisdictions indicating the existence there of what has sometimes been called "criminal equity," in accordance with which injunctions have been granted in special circumstances at the suit of the State for the purpose of preventing violations of criminal statutes.[1] Some of these suits are maintained for the protection of property, public or private. Others are rested upon the theory that persistent and repeated violation of the statute constitutes a public nuisance or a situation equivalent to

---

[1] For discussions of this doctrine and citations of cases see Mack, The Revival of Criminal Equity, 16 Harv. Law Rev. 389; Caldwell, Injunctions against Crime, 26 Ill. Law Rev. 259; and Leflar, Equitable Prevention of Public Wrongs, 14 Texas Law Rev. 427. Many cases are collected in 40 Am. L. R. 1145 and 91 Am. L. R. 315.

a nuisance, and the decisions are justified upon the well
established jurisdiction of equity to enjoin public nuisances.
Still other cases abandon these grounds and proceed simply
upon the theory that the State has an interest in the en-
forcement of its own laws and may call upon any of its
courts for legitimate aid to that end.   Cases of this type
commonly lean heavily upon the language of Mr. Justice
Brewer in *In re Debs,* 158 U. S. 564, at page 584.   None of
the cases goes to the length of saying that the injunction
is to be used as a regular method of enforcing the criminal
laws.   In general the cases appear to be limited to instances
of repeated violations, such as continuing to do business or
to carry on a profession without a license where a license is
required for the protection of the public, especially if the
business or profession has to do with the public health,
and where repeated prosecutions might be necessary to
accomplish a final result;   and nearly all the cases stress
the point that in order to justify an injunction the remedies
through ordinary criminal channels must somehow be inade-
quate and ineffective.   An injunction was granted for the
enforcement of usury laws in *State* v. *McMahon,* 128 Kans.
772, *State* v. *Basham,* 146 Kans. 181, *Commonwealth* v. *Con-
tinental Co. Inc.* 275 Ky. 238, and *State* v. *O'Neil,* 205 Minn.
366, and was denied in *People* v. *Seccombe,* 103 Cal. App.
306, and *Ex parte Hughes,* 133 Texas, 505.

Although our own decisions may not be entirely conclu-
sive, their trend is hostile to the development of a "criminal
equity" in cases involving criminal acts not amounting to
a true public nuisance in the conventional sense and not
involving the use of or injury to public or private property,
encroachments upon public easements and the like, and
where the statute itself does not confer equity jurisdiction
in addition to the criminal remedy.   *Attorney General* v.
*Tudor Ice Co.* 104 Mass. 239, 244.   *Attorney General* v.
*Metropolitan Railroad,* 125 Mass. 515, 516.   *Attorney Gen-
eral* v. *Pitcher,* 183 Mass. 513, 519, 520 (a case bearing sub-
stantial points of resemblance to the present one).   *Cam-
bridge* v. *John C. Dow Co.* 185 Mass. 448, 451.   *Attorney
General* v. *New York, New Haven & Hartford Railroad,* 197

Mass. 194, 197. *Kelley* v. *Board of Health of Peabody*, 248 Mass. 165, 168. *Barrows* v. *Farnum's Stage Lines, Inc.* 254 Mass. 240, 243, 244. *Slome* v. *Chief of Police of Fitchburg*, 304 Mass. 187, 188. Compare *Attorney General* v. *Jamaica Pond Aqueduct Corp.* 133 Mass. 361; *Kenney* v. *Consumers' Gas Co.* 142 Mass. 417; *Attorney General* v. *Williams*, 174 Mass. 476, 483; *Chase* v. *Proprietors of Revere House*, 232 Mass. 88, 94; and *Attorney General* v. *Boston & Albany Railroad*, 246 Mass. 292, 296. See *Shuman* v. *Gilbert*, 229 Mass. 225. In this Commonwealth when the Legislature has intended that equity should lend its aid to the enforcement of the criminal law, express provision to that effect has been included in the statute. There are now many instances. Some of them are cited in *Board of Survey of Lexington* v. *Suburban Land Co.* 235 Mass. 108. Such statutory provisions were held constitutional only by a closely divided court in *Carleton* v. *Rugg*, 149 Mass. 550.

The objections to "criminal equity" are that it deprives the defendant of his jury trial; that it substitutes for the definite penalties fixed by the Legislature whatever punishment for contempt a particular judge may see fit to exact; that it is often no more than an attempt to overcome by circumvention the supposed shortcomings of jurors; and that it may result, or induce the public to believe that it results, in the arbitrary exercise of power and in "government by injunction." These objections are substantial. They should cause a court to hesitate to extend the use of the injunction into the criminal field without express legislative sanction.

We need not decide that there can never be a case, beyond the now recognized instances, in which an injunction might be proper in aid of a criminal statute in the absence of an express provision conferring the power to grant one. Some occasion of peculiar urgency may possibly arise. But this is not such an occasion. The remedy by criminal prosecution is complete. The statute has made proof comparatively easy. The penalties are sufficient to take the profit out of an illegal business. Special remedies are also provided by the statute as hereinbefore indicated.

If the Legislature had desired to make available a further remedy in a proceeding like the present one it could easily have made express provision to that effect. There is no reason to suppose that the criminal law has broken down or that juries would not convict a "loan shark" for carrying on an illegal business, if failure of juries can ever be a reason for invoking equity, as some of the cases in other jurisdictions suggest it can be. The Attorney General can prosecute, if he sees fit. He is not dependent upon local officers. *Commonwealth* v. *Kozlowsky*, 238 Mass. 379. If resort to an injunction is permitted in this instance efforts will be made to invoke the same remedy for the enforcement of numerous other criminal statutes the violation of which is no less detrimental to the public welfare than is violation of the small loans law. We are of opinion that the Commonwealth must be remitted to its usual remedies in the criminal courts.

The interlocutory decree overruling the demurrer is reversed, and an interlocutory decree is to be entered sustaining the demurrer, together with a final decree dismissing the bill.

*Ordered accordingly.*