COMMONWEALTH *vs.* UNITED FOOD CORPORATION.

Suffolk. November 9, 1977. — April 11, 1978.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & ABRAMS, JJ.

*Prostitution,* Maintaining premises for. *Evidence,* Reputation, Failure to produce witness, Admissions and confessions. *Jurisdiction, Civil,* Criminal acts. *Contempt. Constitutional Law,* Trial by jury, Contempt proceeding. *District Attorney.*

The word "prostitution" as used in G. L. c. 139, § 4, is not unconstitutionally vague and includes within its meaning the indiscriminate solicitation of any sexual act for hire. [767]

In a civil proceeding under G. L. c. 139, §§ 4-13, 19-20, seeking relief against the maintenance of a nuisance, based on an allegation that the premises were used for prostitution, there was no error in the admission under § 9 of certain evidence as to the reputation of the premises as a place where sexual activities were available for a price. [767-770]

Evidence in a civil proceeding under G. L. c. 139, §§ 4-13, 19-20, warranted a finding that the defendant's premises were used for prostitution and, therefore, constituted a nuisance within the meaning of § 4. [770-773]

Where the Legislature has provided that a particular use of property constitutes a public nuisance, an injunction against the future maintenance of the nuisance may properly be entered without a jury trial and without proof that the conduct constituting a nuisance caused actual harm to public or private interests. [773-779]

The mandatory judgment provisions of G. L. c. 139, § 9, are unconstitutional under art. 12 of the Massachusetts Declaration of Rights in that they may result in the confiscation of property to punish the commission of a crime without a jury trial. [779-781]

In a civil proceeding under G. L. c. 139, §§ 4-13, 19-20, the judge did not abuse his discretion in declining to order a district attorney to testify concerning his purpose in commencing the proceeding. [782-783]

CIVIL ACTION commenced in the Superior Court on January 28, 1977.

The case was heard by *Flynn,* J., a District Court judge sitting under statutory authority.

The Supreme Judicial Court granted a request for direct appellate review.

*Morris M. Goldings (Kenneth H. Tatarian* with him) for the defendant.

*Timothy P. O'Neill,* Assistant District Attorney, for the Commonwealth.

WILKINS, J. The defendant United Food Corporation (United) operates a business under the name of the Two O'Clock Lounge in a so called adult entertainment area on Washington Street in Boston. United leases premises in which there are three stages on which nude dancing is performed. The premises are owned by each of two other defendants below, who are not appellants. The district attorney for Suffolk County commenced this civil proceeding under G. L. c. 139, §§ 4-13, 19-20, seeking relief against the maintenance of a nuisance, based on an allegation that the premises were used for prostitution.

A judge heard the case in the Superior Court without a jury, concluded that acts of prostitution had occurred on the premises, ruled that the premises were a nuisance within the meaning of G. L. c. 139, § 4, and entered a judgment permanently enjoining the defendants from directly or indirectly maintaining the nuisance on the premises. He further directed the sheriff "forthwith to take possession of these premises and sell the furniture, fixtures, musical instruments and moveable property used in maintaining the nuisance in the manner provided by G.L. c. 139, § 9."[1] The judgment was stayed, on certain conditions, pending United's appeal. We granted the Commonwealth's request for direct appellate review.

United raises a variety of challenges to the judgment. We reject those contentions which challenge the finding that a nuisance (use of the premises for acts of prostitution) existed on the premises, and we uphold the judgment in so far as it

---

[1] The judgment also directed the sheriff to close the premises "against their use for one year," unless the defendant landowners acted to protect their interests under G. L. c. 139.

enjoins United from maintaining the nuisance. We conclude, however, that the statutory directions that a defendant's movable personal property must be seized and sold and that the premises must be conditionally closed for one year contain a punitive element which is constitutionally improper in an equitable proceeding to abate a nuisance.

1. United contends that the finding that the premises were used for prostitution is unsupported, arguing that neither (a) the solicitation of sexual acts for hire, as opposed to the acts themselves, nor (b) the solicitation of sexual acts other than coitus constitutes prostitution. As a corollary to this contention, United argues that, in its reference to prostitution, the statute is unconstitutionally vague in violation of Federal and State requirements of due process of law. In our recent opinion in *Commonwealth* v. *King, ante* 5, 12-13 (1977), we rejected a claim that the word "prostitution" was unconstitutionally vague and concluded that the indiscriminate solicitation of any sexual act for hire was embraced within the term. We adhere to our recent views, which fully dispose of these aspects of United's appeal. See *Commonwealth* v. *Bucaulis*, 6 Mass. App. Ct. (1978).[a]

2. United objects to the admission of evidence concerning the reputation of the Two O'Clock Lounge. Section 9 of G. L. c. 139 provides that "[f]or the purpose of proving the existence of the nuisance the general reputation of the place shall be admissible as evidence." Although the general reputation of a place as one where acts of prostitution occur is not itself the offending nuisance, the fact that an establishment has such a general reputation or has quite a different reputation — the statute should be treated as evenhanded — is one element which may be considered in determining whether a nuisance exists. *Chase* v. *Proprietors of the Revere House*, 232 Mass. 88, 95 (1919).[2]

---

[a] 373 N.E.2d 221, 226 (1978).

[2] General Laws c. 139, § 9, properly may be regarded as a statutory exception to the hearsay rule. See *Commonwealth* v. *Edmonds*, 365 Mass. 496, 503 (1974). Fed. R. Evid. 803 (21). General reputation of a place is

In order to assess United's claim that evidence of its general reputation was inadmissible, we must consider the testimony of four witnesses. Edward McNelley, a police officer formerly assigned to the vice control unit of the Boston police department, testified that for two and one-half years from July, 1974, he visited the Two O'Clock Lounge almost every day. When the witness was asked whether he became aware of the general reputation of the premises known as the Two O'Clock Lounge, United objected to a lack of foundation for the question. McNelley then testified that he based his knowledge of the reputation of the Two O'Clock Lounge on his observation of incidents there; on the reputation of employees at the lounge; and on conversations with employees, patrons, undercover police officers, and people who work in and around the adult entertainment area on Washington Street. Over objection, McNelley was permitted to testify that he knew the general reputation of the Two O'Clock Lounge and that its general reputation was that a person could go there and "for a specific price buy a female who would perform certain sexual acts for this individual on the premises."

A detective, who for two years had been assigned to the vice control unit of the Boston police department, testified that he knew of the general reputation of the Two O'Clock Lounge and that he based his knowledge on such contacts in the "combat zone" as conversations with other police officers, with patrons of the lounge, and with people who were knowledgeable from either personal experiences or hearsay. Over objection, he testified that the lounge's general reputation is that it is a place where one can purchase sex for money. Two former patrons of the lounge testified to its general reputation. One, who based his knowledge on "hearsay from people, college friends, and general im-

---

significant in a case such as this, but not because it is itself an ultimate fact. There may be, of course, situations not involved here (such as in libel cases) where general reputation is itself an ultimate fact in issue, and, therefore, reputation evidence lacks any hearsay element.

pression," testified over objection that the lounge had a reputation as a place where "you could have sex with a woman." The other testified, again over objection, that from friends he knew the reputation of the lounge as a place where one could "[g]et what you want as far as sex goes."

United's objections to the admission of this evidence were not well founded. We have already rejected the claim that prostitution is limited to coitus. Thus, testimony concerning the reputation of the lounge as a place where sexual activities were available for a price was material to the issue whether the lounge was used for acts of prostitution.

We agree that evidence of specific events, statements, or opinions may not be used to prove reputation (see *Commonwealth* v. *Belton*, 352 Mass. 263, 269, cert. denied, 389 U.S. 872 [1967]; *F.W. Stock & Sons* v. *Dellapenna*, 217 Mass. 503, 506 [1914]; *Commonwealth* v. *Manning*, 2 Mass. App. Ct. 838, 839 [1974], rev'd on other grounds, 367 Mass. 605 [1975]), but the admitted evidence was not of this kind. The sources for this evidence were numerous and general. The fact that each of the witnesses had direct or indirect knowledge of the performance of specific sexual acts on the premises did not contaminate his testimony as to the lounge's reputation. Nor was testimony as to the present reputation of the lounge rendered inadmissible because a witness's knowledge of the lounge's reputation was of long standing.

The testimony of the police officers was admissible even though cooperating in litigation of this character may be one object of their employment in the vice control unit. Their possible bias went to the weight, not to the admissibility, of their testimony. Their knowledge of the general reputation of the Two O'Clock Lounge was not the product of investigations conducted for the purpose of obtaining such evidence. We have upheld the exclusion of reputation evidence obtained as a result of inquiry by a person not a member of the community. *Commonwealth* v. *Baxter*, 267 Mass. 591, 593 (1929). *Commonwealth* v. *Hunt*, 243 Mass. 286, 287 (1922). See 3 J. Wigmore,

Evidence § 692 (Chadbourn rev. 1970). The police officers made no special investigations, and were members of the community in which the lounge's reputation would be known.

There was nothing improper in one officer's basing his testimony of the reputation of the lounge in part on his knowledge of the professional proclivities of certain employees of the lounge. The law has long recognized that the reputation for chastity of persons who frequent certain establishments is admissible to prove that the establishment was used for prostitution. *Commonwealth* v. *Rivers,* 307 Mass. 225, 226 (1940). *Commonwealth* v. *Kimball,* 7 Gray 328, 330 (1856). That evidence was admissible directly to prove the nuisance and was appropriate support for a witness's knowledge of the general reputation of the lounge.

We find no fatal distinction between asking, as the plaintiff did, "Do you know the general reputation" of the lounge and asking, "Have you heard the general reputation of the lounge?" The latter seems preferable (*Michelson* v. *United States,* 335 U.S. 469, 482 [1948]), but we have not been critical of the former (*Commonwealth* v. *Belton,* 352 Mass. 263, 269 [1967]; *Wetherbee* v. *Norris,* 103 Mass. 565, 566-567 [1870]).

We note, in conclusion, that the general reputation evidence may not have been crucial to the judge's finding of a nuisance because he found alternatively, without reliance on this evidence, that a nuisance existed. However, the admissibility of this evidence bears on United's argument, to which we next turn, that the evidence did not warrant the finding of a nuisance.

3. United challenges the judge's conclusion that the Two O'Clock Lounge constitutes a building used for prostitution and is a nuisance within the meaning of G. L. c. 139, § 4. Because, as we have noted earlier, prostitution includes the offering of any sexual acts for hire, the judge's finding that acts of prostitution occurred on the premises was warranted.

In addition to the lounge's general reputation, which we have held could be considered, there was ample evidence of

specific acts of prostitution. On October 14, 1976, an employee of the lounge agreed to perform fellatio on a customer for $50 and did so in a booth. On November 11, 1976, another employee of the lounge offered to perform sexual acts for a customer for $150 and performed fellatio on him. Employees of the lounge made similar offers on November 20, 1976 (for $46), and on January 12, 1977 (for $100). On January 26, 1977, an employee offered to masturbate an undercover policeman for $40. On February 25, 1977,[3] another employee offered for $60 to engage in fellatio and coitus with another undercover police officer. All but one of these incidents involved contemplated activity in a booth on the premises.

There was evidence that the management knew of and allowed the described acts of prostitution. The judge found that (a) United's president, treasurer, clerk, and manager, George Boucavalas, (b) the manager in Boucavalas's absence, and (c) the floor manager "knew or should have known that certain female employees of the Two O'Clock Lounge were in the practice of regularly soliciting money for illicit sex from patrons." Arguing that an injunction may not issue unless United knew of the existence of the nuisance, a point we assume in its favor without deciding, United seizes on that aspect of the judge's finding that certain management personnel "knew or *should have known*" (emphasis supplied) of the conduct of certain female employees. United claims that knowledge of a fact is not made out by a finding that the person should have known the fact. From a reading of the findings and the entire record, it is clear that United's agents in fact knew what was happening on the premises.

The judge was warranted in drawing an inference adverse to United for failure to produce any witnesses on its behalf. United did not call certain supervisory or managerial personnel who were available to it. The case against United was strong, and the posture of the case was

---

[3] Three days before the trial of this case commenced.

such that United naturally would have been expected to call these witnesses or explain their absence. In these circumstances, an inference against United could fairly be drawn. *Commonwealth* v. *Franklin*, 366 Mass. 284, 293-294 (1974). *Grady* v. *Collins Transp. Co.*, 341 Mass. 502, 509 (1960). That criminal proceedings may have been pending or threatened against United's agents does not forbid the drawing of an adverse inference from United's failure to call these agents to testify in this civil proceeding. See *Commonwealth* v. *McCabe*, 163 Mass. 98, 102 (1895); *Baxter* v. *Palmigiano*, 425 U.S. 308, 317-318 (1976); *Arthurs* v. *Stern*, 560 F.2d 477, 478 (1st Cir. 1977), cert. denied, 434 U.S. 1034 (1978).

The judge also was correct in treating, as admissions binding on United, the silence of United's corporate officer and certain management employees when confronted with statements that specific acts of prostitution occurred on the premises. Similarly the floor manager's response that "I see nothing" was an admission binding on United when a policeman, standing beside him, asked him if he saw a couple (on whom the policeman had shined his light) involved in an incipient act of fellatio. Although the circumstances surrounding an alleged adoptive admission must be scrutinized with care, the judge was warranted in concluding that the statements were heard and understood by agents of United, and that, in the circumstances, it would have been natural for United's agents to deny the statements if they did not agree with them. See *Commonwealth* v. *Dirring*, 354 Mass. 523, 535 (1968); *Commonwealth* v. *Porter*, 237 Mass. 1, 4-5 (1921); *Commonwealth* v. *O'Brien*, 179 Mass. 533, 534 (1901). Cf. *Commonwealth* v. *Simpson*, 370 Mass. 119, 123 (1976). Assuming, without deciding, that United, a corporation, may rely on any right of its agents not to reply and thus avoid any inference against it, none of United's agents was in custody and thus not expected to reply, nor did any agent assert a constitutional right to remain silent in circumstances in which no inference could properly be drawn

against him.  See *Commonwealth* v. *Sazama*, 339 Mass. 154, 156-159 (1959).

Considering the evidence as a whole, the judge was warranted in finding and ruling that the premises were used for prostitution and, therefore, constituted a nuisance.

4. We come then to the question whether it is permissible under the Constitution of the Commonwealth to authorize injunctive relief against United's maintenance of the alleged nuisance in a proceeding in which the defendant is not assured of the right to a jury trial. The trend of our decisions has been "hostile to the development of a 'criminal equity' in cases involving criminal acts not amounting to a true public nuisance in the conventional sense and not involving the use of or injury to public or private property, encroachments upon public easements and the like, and where the statute itself does not confer equity jurisdiction in addition to the criminal remedy." *Commonwealth* v. *Stratton Fin. Co.*, 310 Mass. 469, 473 (1941). Thus, our courts normally will exercise equitable powers in the enforcement of the criminal law only where a statute expressly authorizes such action (*id.* at 474; *Revere* v. *Aucella*, 369 Mass. 138, 147 [1975], appeal dismissed sub nom. *Charger Invs., Inc.* v. *Corbett*, 429 U.S. 877 [1976]) and, even then, only when the statute is constitutional.[4]

The almost unanimous weight of authority in this country supports the use of injunctions, issued under statutory authority, to bar the maintenance of nuisances on particular

---

[4]Expanding on the reasons why nonstatutory "criminal equity" jurisdiction should be looked on with disfavor, Justice Qua, speaking for the court, wrote (310 Mass. at 474): "The objections to 'criminal equity' are that it deprives the defendant of his jury trial; that it substitutes for the definite penalties fixed by the Legislature whatever punishment for contempt a particular judge may see fit to exact; that it is often no more than an attempt to overcome by circumvention the supposed shortcomings of jurors; and that it may result, or induce the public to believe that it results, in the arbitrary exercise of power and in 'government by injunction.' These objections are substantial. They should cause a court to hesitate to extend the use of the injunction into the criminal field without express legislative sanction."

premises, consisting of the use of premises for such activities as the unlawful sale of alcoholic beverages, illegal gambling, or the carrying on of unlawful sexual activities. See, e.g., *Mugler* v. *Kansas*, 123 U.S. 623 (1887); *Eilenbecker* v. *District Court of Plymouth County*, 134 U.S. 31 (1890); *Grosfield* v. *United States*, 276 U.S. 494 (1928); *State ex rel. Rhodes* v. *Saunders*, 66 N.H. 39 (1889); *State* v. *Murphy*, 71 Vt. 127 (1898); *Davis* v. *Auld*, 96 Me. 559 (1902); *State* v. *Ehrlick*, 65 W. Va. 700 (1909); *Fulton* v. *State*, 171 Ala. 572 (1911); *State ex rel. English* v. *Fanning*, 96 Neb. 123 (1914); *State ex rel. Kern* v. *Jerome*, 80 Wash. 261 (1914); *Williams* v. *State ex rel. McNulty*, 150 Ga. 480 (1920); *King* v. *Commonwealth*, 194 Ky. 143 (1922); *Commonwealth* v. *Dietz*, 285 Pa. 511 (1926); *Pompano Horse Club, Inc.* v. *State ex rel. Bryan*, 93 Fla. 415 (1927); *People ex rel. Lemon* v. *Elmore*, 256 N.Y. 489 (1931). See also *United States* v. *Cappetto*, 502 F.2d 1351 (7th Cir. 1974), cert. denied, 420 U.S. 925 (1975); Caldwell, Injunctions Against Crime, 26 Ill. L. Rev. 259 (1931); Whitebloom, Equitable Law Enforcement and the Organized Crime Control Act of 1970 — United States v. Cappetto, 25 DePaul L. Rev. 508, 511-515 (1976); Leflar, Equitable Prevention of Public Wrongs, 14 Tex. L. Rev. 427, 429 n.7 (1936).[5] Numerous jurisdictions have not required statutory authorization in order to sustain the use of such injunctions. See, e.g., *State ex rel. Vance* v. *Crawford*, 28 Kan. 726 (1882); *Littleton* v. *Fritz*, 65 Iowa 488 (1885); *State ex rel. Crow* v. *Canty*, 207 Mo. 439 (1907); *Fulton* v. *State*, 171 Ala. 572 (1911); *Stead* v. *Fortner*, 255 Ill. 468 (1912); *State ex rel. Wilcox* v. *Ryder*, 126 Minn. 95 (1914); *Marvel* v. *State ex rel. Morrow*, 127 Ark. 595 (1917); *State ex rel. Herigstad* v. *McCray*, 48 N.D. 625 (1921); *Bunkley* v. *Commonwealth*, 130 Va. 55 (1921); *State ex rel. Attorney Gen.* v. *Thekan*, 184 Wis. 42 (1924);

---

[5] As long ago as 1903, it was acknowledged that the practice of enjoining public nuisances, which were also crimes, had developed to the point where relief from such practices could be obtained only by legislation. Mack, The Revival of Criminal Equity, 16 Harv. L. Rev. 389, 403 (1903).

*Oklahoma Kennel Club* v. *State ex rel. Bishop,* 155 Okla. 233 (1932); *People* v. *Lim,* 18 Cal. 2d 872 (1941); *State* v. *Sportsmen's Country Club,* 214 Minn. 151 (1943); *Black* v. *Circuit Court of Eighth Judicial Circuit,* 78 S.D. 302 (1960); *State ex rel. Carlson* v. *Hatfield,* 183 Neb. 157 (1968).

Many of these decisions have proceeded somewhat formalistically, characterizing the judicial action as equitable in nature and thus free from any constitutional requirement of a jury trial. Better reasoned opinions focus on the legislative purpose of the statutes. In upholding that part of a judgment which enjoined an owner of a house from permitting his premises to be used for prostitution, the Court of Appeals of New York noted that the statute authorizing such an injunction "extended an equitable remedy in a field where courts of equity had been reluctant to interpose their powers." *People ex rel. Lemon* v. *Elmore,* 256 N.Y. 489, 493 (1931). The Court of Appeals concluded, however, that the State Constitution's grant of an inviolate right to a jury trial was not offended by a statutory broadening of the court's equitable powers. *Id.* The judicial response was said not to relate to a defendant's criminal conduct but to assure "an appropriate means of definitely and completely ending the nuisance." *Id.* at 494. The focus of the judicial order is on future maintenance of the nuisance and not on prior criminal acts.

A distinctly minority position was taken by the New Jersey Court of Errors and Appeals in *Hedden* v. *Hand,* 90 N.J. Eq. 583 (1919). There, the court agreed that the statute improperly attempted to give a court of equity jurisdiction over "a subject-matter of a purely criminal character." *Id.* at 587. That court found a constitutional prohibition against the use of "criminal equity" to abate future immoral, criminal acts. It may be doubted that this view is still the law of New Jersey. See *Mayor of the Borough of Alpine* v. *Brewster,* 7 N.J. 42, 51-52 (1951).

The propriety of the use of injunctions against future conduct involving illegal activities on particular premises arose

here earlier than in most other jurisdictions, but under a statute which was substantially less detailed than G. L. c. 139, §§ 4-13, 19-20. In *Carleton* v. *Rugg*, 149 Mass. 550 (1889), the court was asked to rule on the constitutionality of St. 1887, c. 380, § 1, which is set forth in the margin.[6] That statute conferred jurisdiction on this court and the Superior Court to "restrain, enjoin or abate," as a common nuisance, any place resorted to for "prostitution, lewdness, or illegal gaming" or used "for the illegal keeping or sale of intoxicating liquors," and gave the judge the discretion to issue an injunction. The court concluded that the statute was constitutional and did not conflict with the guaranty of art. 12 of our Declaration of Rights, that "no subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges, . . . but by the judgment of his peers, or the law of the land." This conclusion rested on "the distinction between a proceeding to abate a nuisance, which looks only to the property that in the use made of it constitutes the nuisance, and a proceeding to punish an offender for the crime of maintaining a nuisance." *Id.* at 553. The court noted, however, that a statute which authorized an injunction to prevent the commission of a crime "would have no legitimate place in our jurisprudence." *Id.* at 556. It viewed the statute before it, however, as authorizing the use of equity to prevent the use of property in a manner declared by the Legislature to be offensive and injurious to the public. *Id.* at 554.

The minority of three Justices saw the statute differently. "The efficacy of the statute . . . depends wholly upon the proceedings that may be taken for punishing violations of

---

[6] "The supreme judicial court and superior court shall have jurisdiction in equity upon information filed by the district attorney for the district or upon the petition of not less than ten legal voters of any town or city setting forth the fact that any building, place or tenement therein is resorted to for prostitution, lewdness or illegal gaming, or is used for the illegal keeping or sale of intoxicating liquors, to restrain, enjoin or abate the same as a common nuisance, and an injunction for such purpose may be issued by any justice of either of said courts."

injunctions." *Id.* at 559-560. The minority saw no limit to the transfer of criminal matters to courts of equity if the statute before the court properly conferred equity jurisdiction. *Id.* at 565. The minority rejected the majority's treatment of the statute as directed against property, not offenders, because "all crimes have some relation to place, as they must be committed somewhere." *Id.* at 566. Moreover, they concluded that statutes against public nuisances "were never enforced in equity anywhere when the Constitution was adopted." *Id.*

In 1914, the Legislature passed St. 1914, c. 624, which is found substantially in the same form today in G. L. c. 139, §§ 4-13, 19-20. In *Chase* v. *Proprietors of the Revere House,* 232 Mass. 88 (1919), the court gave unanimous approval to the statute against a challenge founded on art. 12 of our Declaration of Rights and the Fourteenth Amendment to the Constitution of the United States. In respects important to United's argument in the case now before us, the court said, *supra* at 99, citing *Carleton* v. *Rugg,* that "[t]he jurisdiction of a court of equity over nuisances had been recognized and established before the adoption of our Constitution, and the remedy being purely equitable, whether issues should be framed [for a jury] was not a matter of constitutional right but was within the discretion of the judge." The opinion did not discuss the statutory provisions which deny any discretion to the judge to decide, when the existence of the nuisance has been established, whether an injunction should issue, or what form it should take. The court considered due process with respect to notice to the defendant and a right to a hearing, but did not consider the arguably punitive aspects of the forced sale of tangible personal property and the forced, although conditional, closing of the premises for one year.

Comparable legislation dealing with the illegal keeping, sale, or manufacture of liquor survived various constitutional challenges in *Reale* v. *Superior Court,* 265 Mass. 135 (1928). The court, relying on *Carleton* v. *Rugg,* 149 Mass. 550 (1889), rejected a claim that the statute was penal in

nature. Accepting "the distinction between punishment of an offender for the crime of maintaining a nuisance and civil proceedings to abate the nuisance" (*Reale* v. *Superior Court, supra* at 138), the court held that taking possession of a defendant's personal property was not a taking of his property without due process of law. The court noted that "[t]he provision in the statute permitting the seizure and sale of personal property used in maintaining the nuisance is for the purpose of paying the expenses of the abatement suit, since . . . any balance remaining after payment of these costs is to be returned to the owner." *Id.* at 141.

Although the distinction between punishment for past acts and an injunction against future illegal use of property is well established, it must be granted that in a case of this kind, an injunction might be a prelude to a juryless contempt proceeding by which a person may be punished for conduct which is both contemptuous and criminal. We need not be concerned here with popular dissatisfaction with any judicial circumvention of jury trials because the Legislature has authorized injunctions in these circumstances. Moreover, the potential for substantial judicial circumvention of the jury system in cases of this kind has been restricted greatly because a jury trial must be made available for any person charged with criminal contempt where the possible penalty is imprisonment for more than six months. *Matter of DeSaulnier (No. 3)*, 360 Mass. 769, 775 (1971). *Muniz* v. *Hoffman*, 422 U.S. 454, 475-476 (1975).

Legislative authorization of a judicial act does not resolve, however, a constitutional claim that the judicial act denies the constitutional right to a jury trial. Assuming that United now may advance all aspects of such a claim, we adhere to our previous views, consistent with the great weight of authority in this country, that an injunction against the future maintenance of a public nuisance may properly be entered without the involvement of a jury. We further believe that the Legislature may provide that particular uses of property constitute public or common nuisances and may make that conduct subject to injunction without

any proof that, in the particular case, the conduct caused actual harm to public or private interests.

We acknowledge that prohibitory legislation of the character involved here might have been enacted because criminal sanctions against houses of prostitution and other nuisances proved to be inadequate. Thoughtful analysis has led to the view that criminal equity historically has become involved only where criminal remedies have proved over time to be ineffective, that is, where the remedy at law has been shown to be inadequate. Leflar, Equitable Prevention of Public Wrongs, 14 Tex. L. Rev. 427, 448-449 (1936). But we do not view such legislation or proceedings under it as being in aid of criminal prosecution. Rather, the legislative goal is to eliminate nuisances, and the Legislature may seek to achieve that end by both criminal and equitable proceedings.

We thus affirm that portion of the judgment which orders an abatement of the nuisance, and turn our attention next to those aspects of the judgment which go beyond an injunction against the maintenance of the nuisance.

5. In order to fall within the category of legal actions which do not require a jury, the judgment in this case must be free from any solely punitive element. We think that G. L. c. 139, §§ 4-13, 19-20, fail in part to meet this test, because the statute denies any discretion to the judge and requires him to order particular results which, in some instances as to the person who maintained the nuisance, may be punitive.

The statutorily mandated form of judgment denied United any opportunity for the exercise of judicial discretion in its favor. If the judge had discretion concerning the form of the judgment, he could be certain that the judgment contained only such orders as were appropriate and necessary to abate the nuisance. But, under the statute, the leased premises must be ordered closed for one year, and a tenant can do nothing to avoid that consequence.[7] "[A]ll furniture,

---

[7] A landowner of premises where a nuisance was maintained may be relieved of the one year closing, if he pays all costs of the abatement pro-

musical instruments and movable property used in main-
taining the nuisance" must be sold and the proceeds used
first to pay certain costs, fees, and allowances. G. L. c. 139,
§§ 9, 10.[8] Neither the closing of the premises for one year
nor the sale of all the tangible personal property may be rea-
sonably necessary to achieve the permissible statutory goals
of abating the nuisance and recovering the costs of the pro-
ceedings. Yet the statute denies a defendant any possibility
of a judgment which is less harsh. If any portion of the judg-
ment is unnecessary to the permissible statutory goals, the
judgment, arrived at without a jury trial, may have improp-

---

ceedings, files a surety bond in the full value of the premises assuring that
the nuisance will be abated and not reestablished within one year, and
satisfies the judge of his good faith. G. L. c. 139, § 11. In such a case, the
premises so closed may be delivered to the owner. It is unclear whether a
tenant of such an owner may resume his tenancy in any circumstances.
Certainly, he has no absolute right if the landowner has terminated the
tenancy under G. L. c. 139, § 19. If the owner has, any benefit of the
tenancy is lost.

[8] The proceeds of the sale of the movable property are to be used to pay
certain costs, fees, and allowances, and any balance is to be paid to the
owner of the property. G. L. c. 139, § 10. The imposition of such costs,
fees, and allowances is a reasonable adjunct to any judgment enjoining
the maintenance of the nuisance. However, the forced sale of movable
property as an automatic consequence of a finding of a nuisance may be
unreasonable and punitive. A simple order to the defendant to pay costs
may be sufficient, perhaps with the movable property held as security. An
order to sell all the movable property may be unnecessary to cover such
costs, fees, and allowances.

In this case, the judgment makes no reference to the specific property to
be sold and contains no determination of the amount of costs, fees, and
allowances. It is incumbent on the plaintiff to prove which property may
be made subject to a judgment and to establish the amount of the costs,
fees, and allowances. There is nothing in this record to show that any
movable property used in maintaining the nuisance was owned by anyone
other than United.

We note that the judgment here went beyond the terms of the statute
and, as prayed for in the complaint, ordered the sale of all fixtures. This
aspect of the judgment normally might be of interest to the owners of the
premises, but they have not appealed. It is, of course, possible that under
its leases United owns all the fixtures, but it makes no separate argument
concerning them.

erly included a purely punitive element.[9] The statutory purpose is unconstitutional to the extent that, without a jury trial, it seeks to confiscate property to punish the commission of a crime. *Fisher* v. *McGirr*, 1 Gray 1, 37 (1854).[10] In order to preserve the basic statutory goal of authorizing nonjury proceedings to abate certain nuisances, we hold that the mandatory judgment provisions of G. L. c. 139, § 9, are unconstitutional under art. 12 because they may impose a penalty on United. In order to avoid the unconstitutional aspects of the statute, and to achieve the basic legislative purpose, we conclude that the judge must have discretion to fashion the judgment in this case, and we remand the case for that purpose.[11]

---

[9] United did not request a jury trial. The statute and our prior decisions make it clear, however, that a defendant in a civil proceeding under G. L. c. 139, § 6, is not entitled to a trial by jury. In this case we hold that, in so far as such proceedings involve a solely punitive aspect, a defendant has a constitutional right to a trial by jury, and there is no indication here that United waived that right. Although the Commonwealth asserts that United may have lost its right to a trial by jury by not claiming it, the Commonwealth does not argue that as a corporation United was not entitled to a jury trial. United's answer challenged the Commonwealth's right to obtain complete relief in a purely equitable proceeding. This was sufficient to entitle United to challenge the statutory procedure, including the intended trial of the case without a jury.

[10] In *People ex rel. Lemon* v. *Elmore*, 256 N.Y. 489 (1931), the court struck down a $300 "tax" required by statute to be imposed on the defendant, holding that no such penalty should be imposed without a jury trial. The judgment entered in that case did not provide for the sale of any property used in conducting the nuisance, and the Court of Appeals said that "[w]e do not now consider whether those parts of the statute authorizing such sale are valid." *Id.* at 496.

[11] The procedures set forth for the abatement of nuisances, described in G. L. c. 139, §§ 4, 9, do not call for the forfeiture to the Commonwealth of property used in the commission of a crime. The movable property, as we have said, is to be sold only for the purpose of paying certain costs, fees, and allowances. The premises are to be closed, subject to certain conditions, but neither the premises nor the right to use them for a period of time are forfeited to the State. We need not consider, therefore, whether the owner of property subject to forfeiture may be entitled to a jury trial. Under our general forfeiture statute, any claimant to the property is "entitled to claim a jury trial upon issues of fact as in other civil actions." G. L. c. 257, § 6. But not all forfeitures are governed by that statute. See,

6. The judge did not abuse his discretion in declining to order the district attorney for Suffolk County to testify. United wanted to question the district attorney concerning his purpose in commencing this proceeding, and made an offer of proof that the district attorney would answer that the intent of the proceedings was "to prevent the repeated commission of a criminal act by the punishment, or the threatened punishment, of a person or persons charged with having committed it." This language is taken from the dissent in *Carleton* v. *Rugg*, 149 Mass. 550, 561 (1889), and is there set forth in conjunction with the view that "proceedings under this statute" are inconsistent with the right to a jury trial under art. 12 of our Declaration of Rights. A majority of the court, as we have noted in part 4 of this opinion, concluded that proceedings of this character would be inappropriate if they were intended to enforce the criminal law but are constitutional as proceedings equitable in nature, directed against the property on which the nuisance was maintained. *Id.* at 553-554, 556. United's attempt to obtain the district attorney's testimony appears to have been intended solely to support its argument that the statutory pattern involves an unconstitutional restraint on its right to

---

e.g., G. L. c. 64C, § 8, concerning illegally possessed cigarettes; G. L. c. 269, § 10 (*e*), concerning unlawful possession of certain weapons; G. L. c. 271, § 5A, calling for forfeiture and disposition of certain gambling devices according to the provisions of G. L. c. 276. Under the Constitution of the United States, forfeiture proceedings have been treated as civil in nature, unaffected by the existence or absence of a prior criminal conviction, and, if the statute so provides, uninfluenced by the fact that the owner of the property neither participated in nor knew of the illegal use to which his property was put. See *Calero-Toledo* v. *Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974); *One Lot Emerald Cut Stones & One Ring* v. *United States*, 409 U.S. 232 (1972); *Various Items of Personal Property* v. *United States*, 282 U.S. 577 (1931); *Goldsmith-Grant Co.* v. *United States*, 254 U.S. 505 (1921). We have not had much occasion to consider rights under the Constitution of the Commonwealth relating to forfeiture of property. We have said that a statute is improper to the extent that, without a jury trial, it seeks to confiscate the defendant's property because he has committed a crime. *Fisher* v. *McGirr*, 1 Gray 1, 37 (1854).

a trial by jury. We have already considered and disposed of that point. The motives of the district attorney, who was proceeding in conformity with procedures prescribed by the Legislature, are irrelevant. If injunctive relief against United is constitutionally permissible, it does not matter that the district attorney personally may feel that such an injunction would also deter criminal activity. Just as a district attorney has wide discretion not to proceed with a matter (*Manning* v. *Municipal Court of the Roxbury Dist.*, 372 Mass. 315, 318 [1977]), he has wide discretion, in the absence of any showing of misconduct or violation of constitutional right, to elect to proceed with a matter.

7. The judgment must be vacated in part, and the case remanded to the Superior Court for further proceedings. We affirm that portion of the judgment which permanently enjoins United from maintaining the nuisance at 634-642 Washington Street. That portion of the judgment which directs the sheriff to "sell the furniture, fixtures, musical instruments and moveable property used in maintaining the nuisance" may have to be modified, perhaps after a further hearing.[12] The judge should consider the need and desirability of an order closing the premises, applying his discretion in light of all relevant factors. In exercising that discretion, the judge shall give consideration to the Legislature's expression that premises on which such a nuisance has been maintained should be closed. He may conclude, however, that no closing or a more limited closing than for one year would be appropriate. The judge, of course, may enter interlocutory orders to be in effect while he is considering the matter further. The rescript shall issue to the Superior

---

[12] A direction to sell property is improper as an element of the initial judgment unless a plaintiff has shown that the costs, fees, and allowances exceed the value of that property and that the defendant cannot or will not pay such items. An occasion may arise for the entry of such an order under the court's continuing jurisdiction to assure compliance with an injunction, and to assure the payment of costs, fees, and allowances. The reference in the judgment to the sale of fixtures was, in any event, in excess of the statutory direction.

Court forthwith. Mass. R. A. P. 23, as amended, 367 Mass.
920 (1975).

*So ordered.*