Agnes, A.J.
INTRODUCTION
This is a civil action in which the Commonwealth of Massachusetts seeks a preliminary injunction to restrain the maintenance of a nuisance by the defendants and to enjoin them from removing fixtures from the property until further order of the court. See G.L.c. 139, §8. In addition to this civil proceeding, the Commonwealth also has sought and obtained an indictment against the corporate defendant for keeping or maintaining a building used for lewdness in violation of G.L.c. 139, §5 (exhibit 5).[1]
FACTUAL BACKGROUND
“By definition, a preliminary injunction must be granted or denied after an abbreviated presentation of the facts and the law.” Packaging Industries Group, Inc. v. Cheney, 380 Mass. 606, 619 (1980).[2] The court conducted an evidentiary hearing in this matter on March 30, 2005. Based on the credible testimony and exhibits, I make the following findings of fact. The defendant Robert Hurwitz[3] owns the real property located at 68 Franklin Street in the City of Worcester (see exhibits 5 & 6), and the defendant Can-Port Amusement Corporation operates a licensed[4] movie house at that location known as the Paris Cinema. (Defendants hereafter referred to as “theater” or “Paris Cinema”). See exhibits 1, 2, and 3. The court heard testimony from six Worcester Police officers each of whom had many years of experience as police officer and each of whom described in detail the observations they made on various occasions while inside the Paris Cinema. On six occasions during the months of January, February, and March 2005, during both daytime and evening hours, officers of the Worcester Police Department, acting on the basis of unspecified complaints about illegal activity occurring in the theater, paid a $10.00 admission charge to enter the theater, walked to the upper and lower theaters where films were showing, and made observations of men engaging in various sexual acts including men masturbating themselves while sitting in their seats, men standing and masturbating themselves and other men, men engaging in oral sex with other men, and men engaging in anal sex with other men. The police observations included witnessing men with their penises exposed as they sat or stood while the movie was being screened, and men dropping their trousers and engaging in masturbatoiy behavior or oral sex while the movie was being screened.[5]
The conduct in question took place in plain view of the police officers and others who were inside the theater. In some instances, patrons walked over to the men who were engaging in sexual activity and appeared to make close-up observations of the sexual activity for a few moments before walking away.
The police visits to the theater lasted on most occasions for only 10-15 minutes. The conduct observed by the police took place while adult films were showing depicting men and women engaging in various sexual acts. The conduct did not appear to cause any shock or alarm on the part of any of the persons who were inside the theater at the time that the police made their observations. None of the men arrested or observed by the police to be engaging in oral sex or anal sex were using condoms, and no condoms were observed inside the areas of the theater where the films are shown. Condoms are available to persons who enter the theater. There is some sort of sign in the lobby forbidding patrons from engaging in sexual acts inside the theater, but it was not displayed in a prominent location, and was not observed by all of the officers who were in that area.
The officers who made the observations were dressed in plain clothes and did not make arrests at first. However, on January 14, 2005 the police made eleven arrests inside the theater and charged the men who were involved with criminal violations including unnatural acts and open and gross lewdness (G.L.c. 272, §16). Six arrests were made the following day. Fewer arrests have been made during the most recent investigative operations that have been mounted by the police. In each case where an arrest was made, the subject was handcuffed inside the theater after the lights were turned on and brought outside in custody *213 through the lobby in full view of the staff of the theater. The parties have stipulated that as a result of the police activities described above and the publicity that has followed in the local press, the owners and operators of the theater were on notice as early as January 2005 that sexual activity was taking place inside the theater among and between patrons.
DISCUSSION
I
In deciding whether to grant a preliminary injunction, the court is required to perform a multi-part analysis. Packaging Industries Group, Inc. v. Cheney, 380 Mass. 606, 616-17 (1980). Generally, the court must determine whether the moving party has demonstrated a likelihood of success on the merits, and that it faces a substantial risk of irreparable harm— losses that cannot be repaired or for which compensation will not be adequate after final judgment — if the motion for the preliminary injunction is not granted. Id. at 617 & n. 11. If the moving party has met this burden, the court must then engage in a balancing test in which the irreparable harm faced by the moving party is compared to the harm that an injunction would inflict on the other party. “If the judge is convinced that failure to issue the injunction would subject the moving party to a substantial risk of irreparable harm, the judge must then balance this risk against any similar risk of irreparable harm which granting the injunction would create for the opposing party.” Id. at 617. In balancing these factors, “[w]hat matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits. Only where the balance between these risks cuts in favor of the moving party may a preliminary injunction properly issue.” Id. Furthermore, in an appropriate case, “the risk of harm to the public interest also may be considered.” Brookline v. Goldstein, 388 Mass. 443, 447 (1983). See also LeClair v. Town of Norwell, 430 Mass. 328, 337 (1999); Commonwealth v. Mass. CRINC, 392 Mass. 79, 89 (1984).
In a case such as this, the moving party need not show irreparable harm when they are “the government or a citizen, acting as a private attorney general to enforce a statute or a declared policy of the Legislature.” LeClair, supra, 430 Mass, at 331-32 (1999). In such circumstances, a court must first consider whether the plaintiffs are likely to prevail on the merits, and then determine whether injunctive relief will benefit or harm the public interest. Id., citing Mass. CRINC, supra, 392 Mass. 79, 89 (1984). Hence, the public interest is a factor in this Court’s determination in whether to grant either preliminary or permanent injunctive relief. Id. The moving party bears the burden of showing a likelihood of success. John T. Callahan & Sons, Inc. v. City of Malden, 430 Mass. 124 (1999).
II
A. Success on the Merits
G.L.c. 139, §4 provides in part that “[e]very building, part of a building, tenement or place used for prostitution, assignation or lewdness, and every place within or upon which acts of prostitution, assignation or lewdness are held or occur, shall be deemed a nuisance.” Under G.L.c. 139, §6, the district attorney is authorized to bring a civil action in the name of the Commonwealth against the person or persons “conducting or maintaining” such a nuisance as well as against the owner of the building or place where the nuisance exists to enjoin them from “directly or indirectly maintaining or permitting such nuisance.” Here, the Commonwealth maintains the defendants are keeping or maintaining a nuisance at the Paris Cinema located at 68 Franklin Street in Worcester because they are permitting it to be used by persons who are engaging in acts of “lewdness” as that term is used in G.L.c. 139, §4. Based on the evidence presented at the hearing held on March 30, 2005 and the fair inferences to be drawn from the evidence, I find that the defendants are aware that patrons of the Paris Cinema regularly engage in sexual acts inside the theater in open view of other patrons and visitors, and that these acts consist of unprotected oral sex performed by men on other men and unprotected anal sex by men with other men.
(1) Void for Vagueness Claim
The principal argument advanced by the defendant theater is that G.L.c. 139, §4 is unconstitutional. The constitutionality of the statute was first considered in Chase v. Proprietors of Revere House, 232 Mass. 88 (1919). The backdrop of the case was the concern about prostitution in the hotels and cafes of the City of Boston owing to the large number of soldiers and sailors who were on leave in the city at the time. In Chase, the Supreme Judicial Court observed that courts of equity had long enjoyed the power to suppress a public or private nuisance even in circumstances in which the conduct complained about involved indictable offenses. Chase, supra, 232 Mass, at 94.
In particular, the court noted that the power of the Legislature was not limited to addressing problems associated with the uses of real or personal property that are inherently dangerous. Id. at 96. The court concluded that the statute was constitutional as a valid exercise of the police power, and upheld the rulings of the lower court that evidence of prostitution on the premises of the hotel was sufficient to warrant its designation as a nuisance and the issuance of an injunction to abate it. The Supreme Judicial Court again considered the constitutionality of the statute in Commonwealth v. United Food Corp., 374 Mass. 765, 778-79 (1978), and noted that “we adhere to our previous views, consistent with the great weight of authority in this countiy, that an injunction against *214 the future maintenance of a public nuisance may properly be entered without the involvement of a jury. We further believe that the Legislature may provide that particular uses of property constitute public or common nuisances and may make that conduct subject to injunction without any proof that in the particular case, the conduct caused actual harm to public or private interests."
In United Food Corp., supra, the Court, however, did conclude that certain features of the statutory scheme which require a court, in the exercise of its equitable powers, to not only abate the nuisance but to order that the premises in question must be closed for a year and all personal properly seized and sold were unconstitutional in violation of Article 12 of the Massachusetts Declaration of Rights. Id. at 781. “In order to avoid the unconstitutional aspects of the statute, and to achieve the basic legislative purpose, we conclude that the judge must have discretion to fashion the judgment in this case and we remand the case for that purpose.” Id.
The defendant theater advances several arguments in support of its claim that G.L.c. 139, §4 is unconstitutional. The defendant first maintains that the statute is impermissibly vague because it contains no definition of “lewdness.” It is a basic tenet of Due Process that if people have to guess at the meaning of a statutory or regulatory standard it is invalid and cannot be the basis of either a criminal prosecution or an equitable restraint. See Saxon Coffee Shop, Inc. v. Boston Licensing Board, 380 Mass. 919, 925 (1980), citing Druzik v. Board of Health of Haverhill, 324 Mass. 129, 134 (1949) (regulation void because it “prohibits nothing specific,” “contains no standards,” and “could lead to arbitrary and discriminatory action”). See also Commonwealth v. Williams, 395 Mass. 302, 303-04 (1985).
The question, therefore, is whether the owner and operators of the Paris Cinema, a licensed movie theater open to the public, are left to guess or wonder whether oral and anal sexual intercourse between male patrons inside their theater while films are being shown and in plain view of other patrons is “lewdness” as that term is used in G.L.c. 139. §4. Although the term “lewdness” is not defined in G.L.c. 139, the concept has long been part of our jurisprudence and has received judicial constructions over the years in several contexts. The term “lewd” is in current use in connection with the misdemeanor criminal offenses punishable under G.L.c. 272, §53 including the crime of indecent exposure, see Commonwealth v. Broadland, 315 Mass. 20, 21-22 (1943), quoting Commonwealth v. Cummings, 273 Mass. 229, 231 (1930) (explaining that this crime requires “an intentional act of lewd exposure, offensive to one or more persons”), and the crime of “lewd, lascivious and wanton behavior,” see Commonwealth v. Nebel, 59 Mass.App.Ct. 316 (2003) (explaining that this offense requires the Commonwealth to prove four things beyond a reasonable doubt: first, that the defendant (committed) (publicly solicited another person to commit) a sexual act, second, that the sexual act involved touching the genitals or buttocks, or the female breasts; third, that the defendant did this either for the purpose of sexual arousal or gratification, or for the purpose of offending other people; and fourth, that the sexual act (was) (was to be) committed in a public place, that is, a place where the defendant either intended public exposure, or recklessly disregarded a substantial risk of public exposure at that time and under those circumstances, to others who might be offended by such conduct). The concept is also in current use in connection with the felony criminal offense of open and gross lewdness punishable under G.L.c. 272, §16. See Commonwealth v. Adams, 389 Mass. 265, 271 (1983) (conviction based on conduct consisting of masturbating in automobile); Commonwealth v. Gray, 40 Mass.App.Ct. 901, 901 (1996) (rescript) (conduct consisted of oral sex). If the acts described in the above cases viz., exposure of or touching of one’s genitals, masturbation, and oral sex, were regarded as conduct that met the definition of lewdness for purpose of criminal prosecutions under G.L.c. 272, §16 and G.L.c. 272, §53 then it must have been clear to the defendants in the present case that when patrons enter the theater and during the screening of films perform oral sex on each other and engage in anal intercourse in front of the other patrons they are keeping or maintaining premises where acts of lewdness are taking place.
The defendant theater seeks refuge from this result in the recent decision of the Supreme Judicial Court in Commonwealth v. Quinn, 439 Mass. 492 (2003). In Quinn, Chief Justice Marshall, writing for a unanimous court, answered several questions reported by a trial judge about the construction of G.L.c. 272, §16 (open and gross lewdness) and its relationship to G.L.c. 272, §53 (indecent exposure) insofar as they might apply to the conduct of a person who pulled down his pants revealing his buttocks along with red “thong” underwear in front of several young girls standing outside of a school. The Court explained that in order to convict a person of the felony offense of open and gross lewdness, the Commonwealth must prove that the defendant’s conduct actually caused alarm or shock whereas there is no such requirement for conviction of the misdemeanor offense of indecent exposure. Id. at 496-97. The actual holding in the case is that a person may be prosecuted and convicted of the felony offense of open and gross lewdness on the basis of simply exposing his or her buttocks as a result of wearing a “thong” as long as the other essential elements were proved. Id. at 499. The court added, however, that this construction of the scope of G.L.c. 272, §16 was one not previously established in the cases which had dealt principally with conduct involving the intentional exposure of one’s genitals and sexual conduct such as masturbation, and that the *215 defendant thus may not have had fair notice of the applicability of the statute to the conduct he was charged with committing. As a result, the court concluded that based on considerations of Due Process the defendant could not be prosecuted for a violation of G.L.c. 272, §16. Id. at 500-01.
In the course of explaining this result in the Quinn case, Chief Justice Marshall makes the following observation:
The language of G.L.c. 272, §16, “open and gross lewdness and lascivious behavior,” neither mentions exposure of the buttocks nor, without further judicial construction, informs a person precisely which private body parts may not be exposed. In ordinary usage, “lewdness” or “lascivious behavior” convey no more specific meaning than the terms “lewd” and “wanton,” which we have said failed to reference sufficiently definite conduct and applied only “broadly to conduct which the speaker considers beyond the bounds of propriety.” Commonwealth v. Sefranka, supra at 111, 414 N.E.2d 602, quoting Pryor v. Municipal Court for the Los Angeles Judicial Dist. 25 Cal.3d 238, 246-47, 158 Cal.Rptr. 330, 599 P.2d 636 (1979).
As to judicial construction, our decisions have made clear that the exposure of genitalia may be prohibited by G.L.c. 272, §16. See, e.g., Commonwealth v. Fitta, supra at 395-96, 461 N.E.2d 820 (exposing penis to two ten-year-old boys); Commonwealth v. Adams, 389 Mass. 265, 271, 450 N.E.2d 149 (1983) (driving slowly down public way with penis exposed and masturbating). Our decisions have not otherwise provided sufficiently “clear and definite content” of the range of other conduct that is prohibited. Commonwealth v. Sefranka supra at 115, 414 N.E.2d 602. See Commonwealth v. Arthur, 420 Mass. 535, 541, 650 N.E.2d 787 (1995) (noting that cases under G.L.c. 272, §16, to that date “invariably have involved exposure of the genitalia”). (EN14) And while some decisions have indicated that exposure of “buttocks” is encompassed within the zone of conduct prohibited by statutes outlawing “lewd” or “lascivious” behavior, those decisions did not interpret G.L.c. 272, §16, and could not have provided notice to the defendant that his behavior would violate that statute. See, e.g., Commonwealth v. Sefranka supraat 117-18, 414N.E.2d 602 (noting that touching buttocks for sexual arousal may constitute offense of “lewd, wanton and lascivious persons” under G.L.c. 272, §53); Commonwealth v. Castillo, 55 Mass.App.Ct. 563, 566 &n. 1, 772 N.E.2d 1093 (2002) (“thebreasts, abdomen, buttocks, thighs, and pubic area” are private areas for purposes of indecent assault and battery, G.L.c. 265, §13H).
In short with the exception of the exposure of genitalia, no “longstanding judicial interpretation [of G.L.c. 272, §16] clearly conveys ‘sufficiently definite warning as to the proscribed conduct’ ” Commonwealth v. Fitta supra at 396, 461 N.E.2d 820, quoting Commonwealth v. Jarrett, 359 Mass. 491, 496-97, 269 N.E.2d 657 (1971). This defendant cannot be prosecuted for exposing his buttocks.
Id. at 500-01.
The defendant relies on this passage from the Quinn decision and the dictionary definitions of the term “lewd” set forth in footnote 13 of the Quinn decision (“preoccupied with sex and sexual desire; lustful; obscene; indecent”) to argue that the defendant theater was not fairly on notice that sexual intercourse between male patrons in open view inside its theater was conduct within the scope of the term “lewdness” as it appears in G.L.c. 139, §4. The short answer to this argument, I believe, is that while it might be fairly debatable as to whether a great number of behaviors of a sexual nature by or between adult males in a public place licensed by the City of Worcester as a movie theater are included in the definition of “lewdness,” the defendant theater should have been aware that oral sex and anal sex fell squarely within the definition of “lewdness.” A law is not vague because it demands that people conform their conduct to an “imprecise but comprehensive normative standard so that men of common intelligence will know its meaning.” Commonwealth v. Orlando, 371 Mass. 732, 734 (1977) (citation omitted). For these reasons, I do not believe that the defendants were left to guess or wonder about whether the conduct they permitted to take place inside the Paris Cinema constituted a nuisance. Indeed, there was testimony in this case which I credit that there was a sign somewhere in the lobby area of the theater warning patrons that sexual activity was not permitted.
In the alternative, on the basis of the evidence before the court and the above findings, the Commonwealth has established that the defendant Theater allowed its premises to be used for purposes of prostitution. Although this theoiy was not the focus of the Commonwealth’s argument, it is alleged in the complaint and included as a basis for relief in G.L.c. 139, §4. According to the Supreme Judicial Court, the term “prostitution” is defined broadly to include sexual activity for a fee.
In Commonwealth v. King, 374 Mass. 5, 12 (1977), we noted that the Legislature had not defined prostitution, and so turned to common understanding for definition of the term. We concluded that prostitution is “common indiscriminate sexual activity for hire.” See Commonwealth v. United Food Corp., 374 Mass. 765, 767 (1978); Commonwealth v. Bucaulis, 6 Mass.App. 59, 65-66, cert denied, 439 U.S. 827 (1978). The defendant does not argue that her acts were not common, indiscriminate, or for hire, but rather that they were not “sexual activity.” She argues that “sexual activity” is confined to coitus or oral-genital contact. The language of King — "sexual activity— is broad, and by common understanding, includes the conduct involved here. See People v. Costello, 90 Misc.2d 431, 433, 395 N.Y.S.2d 139 (N.Y.Sup.Ct. 1977) (statute defines prostitution as sexual conduct for a fee; common understanding of sexual conduct *216 includes sexual intercourse, deviate sexual intercourse, and masturbation). We relied on Commonwealth. v. Cook, 12 Met. 93, 97 (1846), to support our definition of prostitution in King. Cook defined prostitution in part as offering one’s body to an “indiscriminate intercourse” and “offering to indiscriminate lewdness.”
We conclude that prostitution includes performing masturbation upon a person’s genitals by another’s hands, for a fee. The term “sexual activity,” resting as it does on the common understanding of the meaning of prostitution, andón Commonwealth v. Cook, supra, includes such acts. Accordingly, we reject the defendant’s contention that the acts proved were not prostitution within the meaning of G.L.c. 272, §53.
Commonwealth v. Walker, 388 Mass. 460, 463 (1983). The parties before the court stipulated and agreed that the defendants were aware that patrons of the theater who were required to pay a fee to gain entrance were openly engaging in sexual activity on the premises. Presumably, all of the patrons knew this as well which may explain why no one appeared to be shocked or alarmed by what was taking place inside the theater. If the payment of a fee to another person in order to obtain sexual gratification from acts performed by another person is sufficient to establish prostitution, then for purposes of this case the payment of a $10.00 fee by patrons of the Paris Cinema to the theater in order to gain admission and to have sex with other patrons inside the theater also constituted prostitution as that term is used in G.L.c. 139, §4. See also Commonwealth v. A Juvenile (No. 2), 6 Mass.App.Ct. 194 (1978) (noting that an essential element of proof common to prostitution is the commercial nature of the sexual transaction).
(2) Sufficiency of the Evidence
The defendant theater also argues that there is no likelihood of success on the merits because in order to prove the offense of open and gross lewdness in violation of G.L.c. 272, §16 the Commonwealth must prove that the conduct of the persons engaging in the allegedly unlawful conduct actually caused shock and alarm. This issue was the central question faced by the Supreme Judicial Court in Commonwealth v. Kessler, 442 Mass. 770 (2004). There, the Supreme Judicial Court held that evidence that two young boys, ages ten and thirteen, who made observations of a man standing in a window across the street and masturbating and whose reaction was nervousness and excitement was not sufficient to establish the felony offense of open and gross lewdness in violation of G.L.c. 272, §16. Consistent with the holding in the Quinn case, discussed above, the Court explained that the crime in question requires proof that the conduct produced alarm and shock on the part of another person who views the behavior. Id. at 773-74, citing Commonwealth v. Fitta, 391 Mass. 394, 396 (1984). Based on this reasoning, the defendant theater argues that there is no likelihood of success in this case in establishing the existence of a public nuisance because there was no evidence that anyone inside the theater was alarmed or shocked by the explicit sexual activity that was observed by the police.
The flaw in this argument is that the defendant equates proof of a public nuisance under G.L.c. 139, §4 with proof of criminal conduct. As the Supreme Judicial Court explained in Chase v. Proprietors of Revere House, supra, “the police power includes all necessary measures for the promotion of the good order of the community and the public morals. It embraces the suppression of nuisances whether injurious to the public health, like unwholesome trades, slaughter-houses and rendering establishments, or to the public morals like gambling-houses and houses of prostitution and ill fame.” 232 Mass, at 96. In the present case, far more is at stake than simply the enforcement of standards of morality or decency. The evidence before the court warrants a finding that patrons of the Paris Cinema are permitted by the owner and managers to engage in unprotected oral and anal intercourse on their premises. This type of behavior presents a grave threat to the health and welfare of the men in question and to society as a whole due to the virulence and ease of transmission of the human immunodeficiency virus (HIV), associated with acquired immune deficiency syndrome (AIDS) and other sexually transmitted diseases (STDs). According to an October 2003 “Fact Sheet” published by the National Institute of Allergy and Infectious Diseases of the United States National Institutes of Health,
“AIDS — acquired immunodeficiency syndrome — was first reported in the United States in 1981 and has since become a major worldwide epidemic. AIDS is caused by the human immunodeficiency virus (HIV). By killing or damaging cells of the body’s immune system, HIV progressively destroys the body’s ability to fight infections and certain cancers. People diagnosed with AIDS may get life-threatening diseases called opportunistic infections, which are caused by microbes such as viruses or bacteria that usually do not make healthy people sick. More than 830,000 cases of AIDS have been reported in the United States since 1981. As many as 950,000 Americans may be infected with HTV, one-quarter of whom are unaware of their infection. The epidemic is growing most rapidly among minority populations and is a leading killer of African-American males ages 25 to 44. According to the U.S. Centers for Disease Control and Prevention (CDC), AIDS affects nearly seven times more African Americans and three times more Hispanics than whites. HIV is spread most commonly by having unprotected sex with an infected partner. The virus can enter the body through the lining of the vagina, vulva, penis, rectum, or mouth during sex.
People with AIDS are particularly prone to developing various cancers, especially those caused by viruses such as Kaposi’s sarcoma and cervical can *217 cer, or cancers of the immune system known as lymphomas. These cancers are usually more aggressive and difficult to treat in people with AIDS. Signs of Kaposi’s sarcoma in light-skinned people are round brown, reddish, or purple spots that develop in the skin or in the mouth. In dark-skinned people, the spots are more pigmented.
During the course of HIV infection, most people experience a gradual decline in the number of CD4 positive T cells; although some may have abrupt and dramatic drops in their CD4 positive T-cell counts. A person with CD4 positive T cells above 200 may experience some of the early symptoms of HIV disease. Others may have no symptoms even though their CD4 positive T-cell count is below 200.
Many people are so debilitated by the symptoms of AIDS that they cannot hold steady employment or do household chores. Other people with AIDS may experience phases of intense life-threatening illness followed by phases in which they function normally.
Because no vaccine for HIV is available, the only way to prevent infection by the virus is to avoid behaviors that put a person at risk of infection, such as sharing needles and having unprotected sex. Many people infected with HIV have no symptoms. Therefore, there is no way of knowing with certainly whether a sexual partner is infected unless he or she has repeatedly tested negative for the virus and has not engaged in any risky behavior. People should either abstain from having sex or use male latex condoms or female polyurethane condoms, which may offer partial protection, during oral, anal, or vaginal sex. Only water-based lubricants should be used with male latex condoms.
See http://www.niaid.nih.gov/factsheets/hivinf.htm. A variety of other harmful Sexually Transmitted Diseases also may easily be transmitted from one person to another as a result of unprotected sex. See http: / /www.cdcnpin.org/scripts/ std/std.asp (Information on STD published by the Centers for Disease Control of the National Institutes of Health). According to a Special Focus Profile on “STDs in Men Who Have Sex With Men,” published by the Centers for Disease Control, which includes data gathered by the Fenway Community health organization in Boston, a primary care health clinic for gay men, there is an increasing incidence of STDs among men having sex with other men, and men who are infected with STDs have a greater likelihood of acquiring and transmitting HIV infection. See http://www.cdc.gov/std/stats/de-fault.htm. (STD Surveillance 2003 “STDs in Men Who Have Sex With Men.”). See also Bragdon v. Abbott, 524 U.S. 624, 640 (1998), discussing Haverkos & Battjes, “Female-to-Male Transmission of HIV,” 268 JAMA 1855, 1856, tbl. (1992) (cumulative results of 16 studies indicated 25% risk of female-to-male transmission. Studies report a similar, if not more severe, risk of male-to-female transmission).
The issue in the case before the court is not whether any of the patrons who were arrested are guilly of criminal violations, but rather whether the premises of a licensed, public movie theater are being kept or maintained as a nuisance. For this reason, I do not believe it is essential for the Commonwealth to establish “shock or alarm” on the part of those who witnessed the conduct in question in order to establish a basis for equitable relief under G.L.c. 139, §4.
(3) First Amendment and Privacy Considerations
The remaining constitutional challenges mounted by the defendant theater concern the implications of equitable relief in a case such as this on the privacy rights of the persons who frequent the Paris Cinema and the First Amendment rights of the theater owner and managers. I begin with the observation made by Justice Blackmun in his dissenting opinion in Arcara v. Cloud Books, Inc., 478 U.S. 697, 711 (1986):[6] “A state has a legitimate interest in forbidding sexual acts committed in public ...”
Contrary to the argument advanced by the defendant Theater, consenting adults do not have a constitutional or common-law right under state or federal law to engage in sexual intercourse in public places. See Lawrence v. Texas, 539 U.S., 123 S.Ct. 2472 (2003) (In striking down as unconstitutional a Texas law that made it a crime for two persons of the same sex to engage in certain sexual activities, the Court explained that “(t]he present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution.”); Gay & Lesbian Advocates v. Attorney General 436 Mass. 132 (2002).
In Gay & Lesbian Advocates, the Supreme Judicial Court explained that under Massachusetts law “consensual conduct in private between adults is not prohibited” by G.L.c. 272, §35 (criminalizing unnatural acts) or by G.L.c. 272, §34 (sodomy). However, the Supreme Judicial Court declined to make any sort of blanket pronouncement that persons are not subject to criminal prosecution simply because they take some measures to hide their conduct from public view. In the present case, the conduct at issue occurred openly in a public movie theater and thus in no sense does such conduct implicate any one’s right to privacy.
With regard to the issue of the impact of equitable relief on the First Amendment activities of the defendant theater, it is sufficient to note, as this court announced at the outset of the hearing, an injunction to restrain the defendants from keeping or maintaining a nuisance in accordance with G.L.c. 139, §6 does not require and should not include an order that personal property should be confiscated or that the movie theater should be closed. This court is of the view that so long as an *218 injunction is fashioned in a way that it (1) prohibits only the unlawful activity taking place inside the theater, and (2) does so without confiscating personal property or closing down the theater and employs the least restrictive methods to accomplish its goal, it is consistent with the demands of both the First Amendment to the United States Constitution and the corresponding provisions of the Massachusetts Declaration of Rights.
B. Consideration of the Interests and Harms
As noted above, in a case in which an injunction is sought to enforce a public policy established by the Legislature, a court must consider whether injunctive relief will benefit or harm the public interest. What this court regards as especially weighty and determinative are the health risks described above associated with men having unprotected sex with other men.
I also consider the public interest in the broadest sense. There was evidence in this case that the Paris Cinema has a reputation as a movie house that caterers to the interests of gay men and that was certainly borne out by the testimony of the police. All the patrons observed by the police were men. Gay men and women have as much right to access sexually explicit films and entertainment offered for viewing in licensed, public establishments as persons with heterosexual orientations, persons who may share an interest in both homosexual and heterosexual entertainments, and persons with an interest in some or all other variations on such entertainment themes. An injunction against keeping or maintaining a nuisance in violation of G.L.c. 139, §4 that seeks to prohibit sexual acts such as those observed by the Worcester Police in this case without restraining the theater from screening sexually explicit films that are not otherwise unlawful and that is narrowly tailored to minimize the financial impact on the defendants will not interfere with this broader public interest in access to the full range entertainments offered in licensed public establishments such as movie theaters.
ORDER
For the above reasons, I find that the Commonwealth has met its burden of proving that the defendants Can-Port Amusement Corporation d/b/a Paris Cinema, and Robert J. Hurwitz are unlawfully keeping and maintaining a nuisance at the location known as the Paris Cinema at 68 Franklin Street in the City of Worcester in violation of G.L.c. 139, §4. I rule that a Preliminary Injunction should issue under G.L.c. 139, §6 against the said defendants ordering and enjoining them to cease and desist from directly or indirectly maintaining or permitting such nuisance.
In order to insure that the equitable order of this court is no more burdensome than necessary to carry out the purposes of G.L.c. 139, §4 and 6, this order shall not take effect until the parties to this hearing have an opportunity to confer and to be heard on the precise terms of the Preliminary Injunction that is to be issued in order to minimize its financial and other impacts on the defendants. Thus, a further hearing in this case will take place on April 1, 2005 at 9:00 a.m. following which a Preliminary Injunction will be issued.

Motions to dismiss the civil case and the criminal case have been filed by the corporate defendant and consolidated by the Regional Administrative Justice for hearing in the criminal case on May 15, 2005. The defendants sought a stay of the proceedings or a continuance of the Commonwealth’s motion for a preliminary injunction until some time after the disposition of the motions to dismiss. The Commonwealth was opposed to any continuance. After the hearing, the defendants’ motions were denied.

Both the Commonwealth and the defendants have asserted a right to trial by jury in papers they have filed with the court, but at the hearing the parties agreed that a jury trial was not required or appropriate in a case such as this in which the relief sought is not punitive, but simply to remedy what is alleged to be a public nuisance. See Commonwealth v. United Food Corp., 374 Mass. 765, 780-81 (1978).

Defendant Hurwitz did not appear for the hearing or participate in it. He filed a pro se motion to continue the hearing which was denied. One of the Assistant District Attorneys prosecuting this case reported that she had had numerous telephone conversations with Mr. Hurwitz since the complaint was filed on February 16, 2005, but that she did not state or even intimate that the case would not go forward in his absence. The defendants received adequate notice of the hearing.

The Paris Cinema is licensed by the City of Worcester to exhibit motion pictures. Exhibit 1.

Several of the officers were permitted to testify, over objection, to the reputation of the defendant theater in the community, but to any specific acts other than what they observed during their investigation in this case. Such evidence is admissible in cases of this nature. See Chase v. United Food Corp., 374 Mass. 765, 769 (1978). Some of the officers who had many years of police experience in the City of Worcester testified that the Paris Cinema had a reputation as place frequented by gay men and a place where men had sex with other men. In light of the observations made by these witnesses inside the theater, this evidence contributed very little to the overall picture, but it does confirm the court’s finding that the defendants know what is taking place inside the Paris Cinema.

In Arcara v. Cloud Books, Inc., 478 U.S. 697 (1986), the United States Supreme Court held that the First Amendment was not implicated by the enforcement of a New York public health ordinance similar to G.L.c. 139, §4 in circumstances similar to those presented in this case because sexual activity by patrons in a public book store was not conduct with a significant expressive element and restricting such conduct by means of a health ordinance of general application did not have the effect of singling out persons involved in expressive activity. On remand to the New York Court of Appeals, the state court modified the injunction that had been issued by the trial court and held that while the state had an interest in prohibiting the sexual activity in question, the New York State Constitution, unlike the United States Constitution, would not permit the state to achieve that legitimate objective by means of an injunction that closed the book store. See The People v. Cloud Books, Inc., 68 N.Y.2d 553, 510 N.Y.S.2d 844 (1986). I assume that the constitutional restrictions on the use of the court’s equity powers described by the New York Court of Appeals and stemming from the safeguards embodied in the New York State Constitution are applicable to an injunction issued by this court based on the protections afforded to expressive conduct under the Massachusetts Declaration of Rights.